2002 ME 8

**Sung Ying CHIU & Sio Tong Chiu o/b/o Gee Keung Chiu**

v.

**CITY OF PORTLAND et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 11, 2001.
Decided: Jan. 17, 2002.

John H. Rich III, Esq. (orally), Steven D. Wilson, Esq., Perkins, Thompson, Hinckley & Keddy, P.C., Portland, for plaintiffs.

James E. Fortin, Esq. (orally), Deborah A. Buccina, Esq., Douglas, Denham, Buccina & Ernst, Portland, (for Keasts), Mark E. Dunlap, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, (for City of Portland et al.), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, and CALKINS, JJ.[*]

CLIFFORD, J.

[¶ 1] Plaintiff Gee Keung Chiu (Kenny Chiu), by his next friends and parents, Sung Ying Chiu and Sio Tong Chiu, appeals from the summary judgment entered in the Superior Court (Cumberland County, *Mills, J.*) on his claims against Mark Keast and Nancy Davis–Keast, and various employees involved in housing inspections for the City of Portland. Chiu contends that the trial court improperly concluded that the Keasts, who were the owners of the premises rented to Chiu's family, did not owe him a duty to repair a defective exterior window located in the Chius apartment through which Kenny fell and was injured. Chiu also contends that the trial court improperly held that the City Defendants were entitled to discretionary function immunity pursuant to the Maine Tort Claims Act, 14 M.R.S.A. § 8111(1)(C) (1980 & Supp.2001). We affirm the judgment on all of Chiu's claims except his negligence claims against the Keasts. Because a dispute of material fact exists as to whether the window was

[*] Wathen, C.J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

within the exclusive control of the Chius, however, we vacate as to those claims.

[¶ 2] The facts as developed for purposes of the summary judgment motion are as follows: On November 25, 1997, six-year-old Kenny Chiu was seriously injured when he fell backward through a third-story exterior window located in the apartment that his parents were renting from the Keasts in a multifamily apartment building at 15 Powsland Street in Portland.

[¶ 3] The window was double-hung, and consisted of an upper and lower section originally intended to slide up and down past one another. The top section consisted of six individual panes, each bordered by a wooden frame. The bottom section of the window consisted of one thirty-inch by thirty-inch acrylic sheet,[1] which was 0.065 inches thick.[2] The acrylic sheet was affixed to the exterior of the wooden frame of the window with caulking and glazing points, which are pointed metal devices that were pressed into the wooden frame to bear against the acrylic sheet and hold it in place.

[¶ 4] The accident occurred when Kenny leaned against the window while sitting on the back of a couch located in front of the window. As he leaned against the window, the acrylic sheet dislodged from the window frame, and he fell three stories to the ground outside.

[¶ 5] Prior to August 21, 1997, a housing inspector at the Division of Inspection Services (DIS) for the City, Amy Powers, conducted an exterior inspection of the building at 15 Powsland Street. Following the inspection, the Keasts received a Notice of Housing Conditions Letter from the City dated August, 21, 1997, signed by the housing inspector and the Field Supervisor of the DIS, Tammy Munson, that listed various violations of the City's Housing Code that were found. The letter specifically referred to the absence of storm-window/screen combinations on the exterior of the building's windows in violation of the Housing Code and stated that a reinspection would be made within thirty days.

[¶ 6] Once an inspection was done and violations were noted, any follow-up inspections of the building would be the responsibility of the housing inspector who conducted the initial inspection. The DIS did not have a formal protocol or practice for scheduling reinspections of properties that had received notices of violations, but rather the housing inspectors decided on whether and when to reinspect a property when a minor or routine violation had been found. The building at 15 Powsland Street was not reinspected prior to the incident on November 25, 1997.

[¶ 7] Count I of Chiu's complaint alleges that the Keasts, as landlords, breached their duty to exercise reasonable care in the repair and maintenance of the window. Count II alleges that the Keasts, as landowners, breached a duty to keep the property reasonably safe for persons legally on the property. Count III alleges that the Keasts breached the statutory warranty of habitability, 14 M.R.S.A. § 6021 (1980 & Supp.2001). Counts IV and V allege that the housing inspector, Field Supervisor, and DIS were negligent in inspecting and in failing to reinspect the apartment building. Count VI alleges that the Chief and the Supervisor of DIS, and the City are

1. Although the terms "plexiglas" and "plexiglass" are commonly used in a generic sense to describe acrylic sheets, "PLEXIGLAS" is a registered trademark of Rohm and Haas Company, Philadelphia, Pennsylvania.

2. Prior to the Keasts' purchase of the building in 1996, the bottom section of the window shattered during a 1995 wind storm. The prior owners of the building repaired the broken window with the sheet of acrylic.

directly liable for negligent supervision, and vicariously liable for the tortious conduct of the inspector and Field Supervisor.[3]

[¶ 8] The Superior Court entered summary judgments in favor of the defendants and against Chiu on all counts, and this appeal followed.

## I.

[¶ 9] When reviewing a grant of summary judgment, we consider only the portions of the record referred to, and the material facts set forth in, the statements submitted pursuant to M.R. Civ. P. 56(h) to determine whether "there [is] no genuine issue as to any material fact and that the successful party [is] entitled to a judgment as a matter of law." *Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. We examine those facts in the light most favorable to the nonmoving party. *Johnson v. Carleton*, 2001 ME 12, ¶ 11, 765 A.2d 571, 575.

[¶ 10] Those facts demonstrate that: (1) the acrylic sheet was an inadequate glazing material because it was flexible enough for Chiu to push the edges of the pane past the glazing points by leaning against it, allowing it to pop out of the frame; (2) the window sash to which the sheet was affixed was in a deteriorated condition and contributed to the accident; (3) Kenny's fall through the window would have been less likely to occur if a storm-window/screen combination had been properly installed; (4) a reinspection of the window would have disclosed the window's condition.

[¶ 11] As a general rule, "a landlord is not liable to a tenant for personal injuries caused by a defective condition in premises under the tenant's exclusive con-

trol." *Nichols v. Marsden*, 483 A.2d 341, 343 (Me.1984). A landlord may be found liable, even when the premises are under the tenant's exclusive control, however, under three well-recognized exceptions:

[A] landlord may be found liable in situations where he: (a) fails to disclose the existence of a latent defect which he knows or should have known existed but which is not known to the tenant nor discoverable by him in the exercise of reasonable care; (b) gratuitously undertakes to make repairs and does so negligently; or (c) expressly agrees to maintain the premises in good repair.

*Id.* (citations omitted). A landlord also is deemed to have control over the common areas of rented premises and may be found liable for injuries caused by a defective condition in those areas. *Id.*

[¶ 12] The absence of control by the landlord is an essential element that the landlord must establish in order to enjoy the shield from liability articulated in *Nichols*. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 11, 694 A.2d 924, 926. "Landlord-tenant liability frequently involves an analysis of whether the tenant took possession of an area, and if so, whether the landlord retained some control over it." *Id.* Those issues are factual. *Id.*

[¶ 13] A tenant gains possession and control of an area through a lease or tenancy agreement. *Rodrigue*, ¶ 10, 694 A.2d at 926. There is no dispute that the Chius were in possession of the apartment pursuant to a valid tenancy agreement. In order for the Keasts to be entitled to summary judgment, however, they must demonstrate that they did not have any control over the exterior windows. We

---

**3.** Until September 2, 1997, P. Samuel Hoffses was the Chief of the DIS. In September of 1997, Mark Adelson became the Supervisor of the DIS.

agree with Chiu that there is a genuine issue of fact as to that issue.[4]

[¶ 14] The fact that the prior landlords had fixed the window through which Kenny fell indicates that the tenants may not have had exclusive control. Mrs. Chiu previously asked Mark Keast to fix or "tighten up" the windows in the living room and he did not disavow his obligation to repair these windows.[5] Moreover, the Keasts had fixed the exterior window adjacent to the window through which Kenny fell.

■ [¶ 15] From the facts presented, a factfinder could determine that the Keasts would have been able to affix a storm-window/screen combination sash onto the exterior of the window, repair the deteriorated wood on the exterior of the window, and make other repairs from outside of the building, without ever having to enter the apartment. Like painting the exterior of the building or fixing the exterior roof of the tenement, the fact that the Keasts could, at least to some extent, repair and maintain the window wholly from outside points to the Keasts having at least some control over the window for purposes of maintenance and repair. Because the Chius have raised an issue of material fact in opposition to the Keasts claim that the exterior window was under the exclusive control of the Chius, the court erred in entering summary judgment on Count I.[6]

## II.

■ [¶ 16] In its judgment dismissing Counts IV and V, the trial judge concluded that the housing inspector and Field Supervisor at the DIS[7] were entitled to discretionary function immunity because even if a reinspection was mandatory, "the reasonable time limit for correction of a violation, the timing of the reinspection, and the consequences for failure to correct a violation are not specified and are left to the discretion of the ... building authority."

■ [¶ 17] The Maine Tort Claims Act gives governmental employees an absolute immunity from personal civil liability for "[p]erforming or failing to perform any

---

4. Chiu also contends that more than one of *Nichols*'s exceptions are applicable and, in addition, urges us to completely abandon the rule in *Nichols*. We do not find it necessary to reach the merits of these arguments.

5. There is some dispute about the exact meaning of Mrs. Chiu's request because both Mr. and Mrs. Chiu speak and understand little English and have had to rely on interpreters to translate questions posed to them and their responses to those question during discovery. Viewing the evidence most favorably to the Chius, however, we assume that she requested that Mark Keast fix and repair the windows in the living room.

6. Count II alleges that the Keasts breached their duties of reasonable care as landowners. The Keasts' duty as landowners must be analyzed according to the law governing landlord-tenant relations. *See Young v. Libby*, 1999 ME 139, ¶ 12, 737 A.2d 1071, 1074 (applying landlord-tenant law in determining whether landlord breached a duty to tenant's child); *Golf Club Co. v. Rothstein*, 97 Ga.App. 128, 102 S.E.2d 654, 656 (1958) (members of tenant's family stand in tenant's shoes for determining if landlord breached a duty). Count II survives pursuant to the analysis relating to Count I, but the counts state essentially the same cause of action.

Furthermore, we agree with the trial court that *consequential* damages are an inappropriate remedy for breach of the statutory warranty of habitability, 14 M.R.S.A. § 6021, and affirm the entry of judgment as to Count III.

7. The Field Supervisor—like the Chief and Supervisor of DIS—did not directly inspect or reinspect the building. Thus, they could be held liable only in their capacities as supervisors.

discretionary function or duty, whether or not the discretion is abused." 14 M.R.S.A. § 8111(1)(C) (1980 & Supp.2001).[8] "Whether a defendant is entitled to discretionary function immunity is a question of law that may be resolved by a summary judgment, absent a genuine dispute of material fact." *Carroll v. City of Portland,* 1999 ME 131, ¶ 5, 736 A.2d 279, 282.

[¶ 18] The parameters of an inspection of a dwelling are not specified in the Portland Housing Code. *See* Portland, Me., Code § 6–117 (Apr. 7, 1986). The Code provides that the health or building authority "shall have the right to enter at all reasonable times into or upon any dwelling or dwelling premises within the city for the purposes of inspecting the dwelling or dwelling premises." *Id.* If an inspection occurs and a violation is found, the owner shall be given a notice of the violation. *Id.* § 6–118. The notice "shall contain a reasonable time limit for the correction" of the violation. *Id.*

> After the expiration of the time for correction of a violation, the health or building authority shall make a reinspection of the premises, and if the violation has not been corrected and no appeal is pending as hereinafter provided, such authority may make such further order as he deems advisable or he may pro-

ceed to take legal action against the person liable for such violation. *Id.* § 6–119.

■ [¶ 19] The issue here is whether there is discretion in the conduct of inspections and reinspections. We must determine whether "the act, omission, or decision *require[s] the exercise of basic policy evaluation, judgment, and expertise* on the part of the governmental employee involved." *Carroll,* ¶ 7, 736 A.2d at 282–83.

■ [¶ 20] Conduct by a governmental employee that involves the formulation of a basic government policy or that is pursuant to a statute, regulation, or guideline that, expressly or impliedly, presumptively grounds the conduct in government policy, is discretionary. *Adriance,* 687 A.2d at 241–42; *see also Grossman v. Richards,* 1999 ME 9, ¶ 8, 722 A.2d 371, 374 (City Alderman is entitled to discretionary function immunity for making allegedly defamatory comments regarding the distribution of public money and potential conflicts of interest during a televised city council meeting, while acting as an Alderman at the time he makes the comments).

[¶ 21] The decision as to when and how to reinspect buildings is a discretionary activity. During 1997, seven inspectors, including one that worked only part-time,

---

8. The Maine Tort Claims Act provides, in pertinent part, the following:

    1. Immunity. Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:

    . . . .

    C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, or ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid;

    . . . .

    The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees . . . who are required to exercise judgment or discretion in performing their official duties.

    14 M.R.S.A. § 8111 (1980 & Supp.2001).

conducted 15,823 inspections, 2287 of which were residential housing inspections. These numbers suggest that individual inspectors carry a large number of cases and have to decide how to allocate their time.

[¶ 22] The ability to prioritize reinspections according to the seriousness of the violation is essential to the effective enforcement of the Housing Code. In implementing and enforcing the Code, the DIS allows the inspectors to determine the priority of reinspections. Neither the Housing Code nor DIS gave any guidance on how to allocate the time for those reinspections. The inspectors make these determinations based on their training, education, and experience. Contrary to the results of inspections of other more dangerous buildings, the initial exterior inspection of the building in this case revealed no "life safety code violations."

[¶ 23] Chiu contends that the Notice Letter, by stating that a reinspection would occur within thirty days and that legal action would be pursued if the building did not comply with the Code upon reinspection, effectively ended any discretion that the inspectors may have had. We disagree. Even if a reinspection had occurred within the period established in the letter, the sanctions to be imposed on the Keasts would have had to be determined by the inspector. The inspector would have had the option of not imposing an immediate sanction, and of establishing a later deadline for compliance. The number of times that the inspector might extend the deadline is not limited by the Code and, in theory, sanctions might never be imposed.

[¶ 24] Moreover, there was discretion in the determination of the scope of the initial

inspection.[9] The Code and the DIS policies are silent on the parameters and scope of a proper inspection. Inspectors determine the appropriate scope. Given the large number of cases each inspector must handle, they cannot conduct a perfectly thorough investigation of each building. In this case, the inspector was unable to gain entry into the premises to conduct an interior inspection and limited the inspection to the exterior of Keasts' building. We will not second guess the inspector's discretionary determination of the scope and manner of an inspection. Thus, summary judgment was appropriate on Counts IV and V.

■ [¶ 25] In Count VI, Chiu alleges that the Field Supervisor, Supervisor, and the Chief of DIS should be held directly liable for their own negligence as supervisors, and vicariously liable for the negligence of their subordinates. The supervision of governmental employees conducting discretionary functions is a discretionary act. *Miller v. Szelenyi*, 546 A.2d 1013, 1021 (Me.1988). Because the inspector's actions were discretionary Chiu's negligent supervision claims were properly subject to summary judgment.

■ [¶ 26] Moreover, the court correctly entered summary judgment on the vicarious liability claims. Vicarious liability can be imposed on governmental supervisors only if the subordinate employee does not enjoy immunity under the Tort Claims Act. *Rippett v. Bemis*, 672 A.2d 82, 88 (Me.1996). Because the inspectors are immune from liability, summary judgment was appropriate on Count VI.

---

9.  Chiu is arguing that the scope of the inspection was inadequate, not that the housing inspector was negligent in its assessment of the items that it did inspect. The inspection did identify the lack of a storm-window sash on the exterior of the window that was a cause of Kenny's fall.

The entry is:

Judgment affirmed in part, vacated in part. The judgment on Counts I and II is vacated. The judgment on Counts III, IV, V, and VI is affirmed.