

STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-21-171

BRUCE COLFER,

        Plaintiff,

        v.

CENTRAL MAINE POWER
COMPANY,

        Defendant.

**ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

In this single-count action for negligence against Defendant Central Maine Power Company ("CMP"), Plaintiff Bruce Colfer seeks to recover damages based on injuries he suffered after falling in a CMP-owned parking lot that was rented by Mr. Colfer's employer, Bath Iron Works ("BIW"). CMP has moved for summary judgment on grounds that it did not have control of the parking lot where Mr. Colfer was injured and thus, did not owe him a duty of care. For the reasons stated below, the court denies CMP's motion.

### Facts

During the relevant timeframe, BIW leased from CMP three parcels of land in Bath that served as a parking lot for BIW's employees. Def.'s S.M.F. ¶¶ 1-3.[1] Adjacent to the parking lot was a "very important" electrical substation and transmission line that was owned and maintained by CMP. Pl.'s S.M.F. ¶¶ 2, 4. While the lease agreement between CMP and BIW excluded the substation and other utility equipment from the leased premises, CMP reserved various rights to use and access the parking lot area for its public utility purposes, as discussed in greater detail below. *See* Def.'s S.M.F. ¶ 1; Serra Aff.

---

[1] The court will refer to the pertinent property as "the parking lot" or "the premises."

1

¶ 4, Ex.1 (hereinafter "lease agreement"). Moreover, under the lease, BIW was tasked with maintaining and removing ice and snow from the parking lot. *See id.*

On February 14, 2020, Mr. Colfer, then an employee of BIW, suffered severe personal injuries when he slipped and fell on ice while walking across the parking lot after his shift ended. Pl.'s S.M.F. ¶¶ 1, 18, 21; Def.'s S.M.F. ¶ 21. The section of the parking area where Mr. Colfer fell was not level and had a grade "like a hill," allowing water to accumulate and refreeze. Pl.'s S.M.F. ¶ 22. Surfaces were icy on the day of the incident and had been in that condition for at least two weeks. Pl.'s S.M.F. ¶¶ 19-20; Def.'s S.M.F. ¶ 25.[2]

Additionally, the following undisputed facts are relevant to the resolution of the present motion: During BIW's tenancy, CMP entered the parking lot on multiple occasions to access and maintain its electrical substation and transmission lines. *E.g.*, Pl.'s S.M.F. ¶¶ 10-12. In 2020, CMP planned to upgrade the substation. Def.'s S.M.F. ¶ 12. For this upgrade, CMP intended to place a trailer and "all the supplies and equipment that's used to operate the substation" in the parking lot. Def.'s S.M.F. ¶ 13. It also planned to close the parking lot, post signage "saying ... do not enter," and erect fencing around the parking lot so that only its own "crews could go in through." Def.'s S.M.F. ¶¶ 7, 14. CMP provided advance notice of the date of the parking lot closure to BIW and its employees, as it had done on a separate occasion when CMP needed to close the parking lot. Def.'s S.M.F. ¶ 7; Pl.'s S.M.F. ¶ 15.

On February 4, 2020, two agents of CMP visited the parking lot to evaluate potential obstacles and safety hazards associated with the upcoming construction project. Pl.'s S.M.F. ¶ 13; Def.'s S.M.F. ¶¶ 16- 17. On February 19, 2020, four CMP agents returned to the premises to observe both the substation and the adjacent neighborhood, and to evaluate their "outreach needs" in advance of the construction and parking lot closure that would occur

---

[2] The precise location where Mr. Colfer fell is not clear based on the summary judgment record.

2

later in the year. Def.'s S.M.F. ¶ 20; Pl.'s S.M.F. ¶ 14.  In addition to these visits, "a whole bunch" of other CMP personnel likely would have been on the premises in February of 2020, including project managers, surveyors, and site engineers, because there was a lot of planning and "preliminary type work" occurring at that time. Pl.'s S.M.F. ¶ 16. Moreover, sometime later, CMP installed a tractor trailer on the premises to use "as a mobile office for [CMP's crews] to work out of." Pl.'s S.M.F. ¶ 31.

## Standard of Review

"A summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, referred to in the statements [of material fact] show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." *Platz Assocs. v. Finley*, 2009 ME 55, ¶ 10, 973 A.2d 743 (quoting M.R. Civ. P. 56(c)). In assessing whether this standard has been met, the court must view the facts in the light most favorable to the non-moving party. *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63. Moreover, "'[a] genuine issue of material fact exists when the evidence requires a fact-finder to choose between competing versions of the truth.'" *Platz*, 2009 ME 55, ¶ 10, 973 A.2d 743. "An issue of fact is material if it 'could potentially affect the outcome of the suit.'" *Id.*

## Discussion

CMP asserts it is entitled to summary judgment because the record reveals that it did not have control of the parking lot where Mr. Colfer was injured; rather, exclusive possession and control belonged to its tenant, BIW. CMP argues that without such control, Mr. Colfer cannot establish that CMP owed him a duty of care—a requisite element of negligence. *Bell v. Dawson*, 2013 ME 108, ¶ 17, 82 A.3d 827 ("'A cause of action for negligence has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury.'").

3

"Under Maine law a possessor of land owes a duty to use reasonable care to all persons lawfully on the premises." *Erickson v. Brennan*, 513 A.2d 288, 289 (Me. 1986). However, a "landlord is generally not liable for a dangerous condition that comes into being after the lessee takes exclusive possession and control of the premises." *Stewart v. Aldrich*, 2002 ME 16, ¶ 10, 788 A.2d 603. This rule applies to injuries sustained by a tenant's guest or others on the premises with the tenant's consent. *Boles v. White*, 2021 ME 49, ¶ 7, 260 A.3d 69.

Nevertheless, a landlord may be found liable for injuries sustained on land over which the landlord is deemed to have "control." *Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984).[3] "The absence of control by the landlord is an essential element that the landlord must establish" in order to be shielded from liability. *Chiu v. City of Portland*, 2002 ME 8, ¶ 12, 788 A.2d 183.

The Law Court has defined "control" to "'mean[] a power over the premises that the landlord reserves pursuant to the terms of the lease or the tenancy, whether express or implied, and does not include the incidental control that comes from being able to threaten tenants with nonrenewal of a lease or with eviction.'" *Boles*, 2021 ME 49, ¶ 8, 260 A.3d 697. "If landlords retain control over common areas in the rental property, they can consequently be held liable for dangerous conditions in those areas." *Stewart*, 2002 ME 16, ¶ 13, 788 A.2d 603. Moreover, "landlords may retain control over non-common areas when they reserve certain rights or responsibilities over the premises by the terms of the lease or tenancy." *Id.*

---

[3] There are various additional exceptions to the general rule of landlord nonliability that do not appear to be at issue for purposes of this motion. Under those exceptions, liability may attach when the landlord "'(a) fails to disclose the existence of a latent defect which he knows or should have known existed but which is not known to the tenant nor discoverable by him in the exercise of reasonable care; (b) gratuitously undertakes to make repairs and does so negligently; or (c) expressly agrees to maintain the premises in good repair.'" *Boles*, 2021 ME 49, ¶ 7, 260 A.3d 697.

Retention of control is a question of fact to be determined in the light of all the significant circumstances. *Chiu*, 2002 ME 8, ¶ 12, 788 A.2d 183; *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 11, 694 A.2d 924. However, control is best ascertained by the intent of the parties as expressed in the lease. *See Boles*, 2021 ME 49, ¶¶ 7-8, 260 A.3d 697. And "unambiguous contract language must be interpreted according to its plain meaning," which presents a question of law. *Id.* ¶ 7.

Here, for CMP to be entitled to summary judgment, it must demonstrate that it did not have any control over the parking lot area where Mr. Colfer was injured. *Chiu*, 2002 ME 8, ¶ 13, 788 A.2d 183. The court finds there is a genuine issue of material fact regarding that issue. The court's analysis begins with the terms of the lease agreement entered by BIW and CMP. Under the lease, CMP agreed to lease to BIW three parcels of land adjacent to Castine street in Bath, excluding from the leased premises "Landlord's transmission sections 55 and 58 consisting of poles, wires, guy anchors, and any other personal property relating to its business as a utility." *Lease Agreement* at p. 1.

Nevertheless, the uses to which BIW could put the property—and BIW's right under the lease—were expressly limited and subject to CMP's use of the land for public utility purposes. Specifically, Section Seven of the lease stated: "Tenant's use of the Premises shall be limited to passenger vehicle parking for its employees and guests only. *Such use and lease rights conveyed hereunder shall at all times be subject to and conditioned upon Landlord's continued use of the Premises for public utility purposes*, including the right to keep maintain, modify, relocate replace [sic] its existing transmission lines, poles and facilities." *Id.* at p. 3 (emphasis added).

To that end, the lease further:

- "Reserve[d] to [CMP] and its employees, agents, contractors, successors and assigns, the nonexclusive right in common with Tenant to pass and repass in suitable and mutually convenient locations along and across the Premises to provide the Landlord, its employees, agents, contractors, successors and assigns access as it deems reasonable necessary to

maintain, increase and improve its use of the Premises in its capacity as an electric utility", *id.* at p. 6;

- Afforded CMP the "right to enter upon the Premises at all times during the term of the Lease to examine and inspect the Premises" without notice, *id*; and

- Allowed CMP to require BIW to clear the parking lot and surrender the premises upon 48-hours' notice so CMP could perform necessary maintenance, repairs, and improvements to its electric transmission and substation equipment. *Id.*[4]

Given CMP's retention of a right to use the premises for public utility purposes—which apparently was superior to BIW's lease rights—along with the other rights CMP reserved under the lease, the court concludes that the lease is ambiguous on the issue of control and does not clearly confer exclusive control to one party or the other. The court's conclusion is unchanged by Section Six of the lease, which describes BIW and CMP's maintenance obligations:

> Tenant shall, throughout the Term of this Lease, at its sole cost and expense, maintain the parking area within the Premises in good condition and repair, safe, clean and free of refuse, obstructions, ice and snow. . . . Landlord shall not be required to maintain the Premises, or to furnish any services, or to make any improvements, repairs or alterations in or to the Premises during the Term of this Lease; except in the event that such maintenance, improvements, repairs or alterations are necessitated by Landlord's actions or negligence.

*Id.* at p. 3.

While BIW had an obligation to maintain the parking lot and keep it free of ice and snow, Section Six contemplated that CMP would maintain the premises when such maintenance was necessitated by CMP's "actions" —a term left undefined. Moreover, based on the reservations of power elsewhere in

---

[4] Additionally, to the extent the slope of the parking lot is an issue in this case, *see* Pl.'s S.M.F. ¶ 22, the court further observes that CMP reserved the right to approve or veto any excavation work that could affect vertical clearance between CMP's transmission lines. *Lease Agreement* at p. 17.

6

the lease, the court is unconvinced that Section Six establishes a definitive intent that BIW assume exclusive control over the parking lot. As one court observed, provisions of this sort are not necessarily determinative of control and are "ambiguous because they could be interpreted as implicating an intention of the landlord to relinquish entirely control of the [premises], or, on the contrary, the lease terms may indicate an intention by the landlord to retain control of these areas but to delegate to the tenants the responsibility for removing snow and ice." *Evans v. United Bank of Ill., N.A.*, 589 N.E.2d 933, 937 (Ill. App. 1992).

Moreover, contrary to CMP's suggestions, the court does not find *Boles v. White* "directly on point" such that *Boles* controls the outcome of this case. 2021 ME 49, 260 A.3d 697. In *Boles*, the plaintiff was injured at a family member's rental home while descending an interior staircase that did not comply with applicable building code. *Id.* ¶¶ 3, 10. The trial court entered summary judgment in favor of the defendant landlord, concluding *inter alia* that the tenants were in exclusive control of the premises, and the landlord did not owe the plaintiff a duty of care. *Id.* ¶ 4.

On appeal, the plaintiff argued that the trial court erred in concluding that the premises was under the exclusive control of the tenant because the landlord had reserved the right to access the premises "for purposes of repair and inspection." *Id.* ¶ 8. The Law Court narrowly framed the issue to be decided as follows: "[W]hether, as a matter of law, the reservation of access in . . . the lease for purposes of 'inspection and repair,' without more, creates a genuine dispute as to whether the [tenants] had exclusive control over the premises, including the interior staircase." *Id.* ¶ 10. It went on to conclude that no such dispute was generated.

In reaching its decision, the Law Court observed that the "general reservation of access for purposes of repair and inspection [wa]s distinct from the landlords' degree of control disputed" in prior decisions where the court had found landlords to be subject to liability. *Id.* "In those cases, there was at

7

least some evidence of shared control in each case between the landlord and tenants—those landlords had actually exercised some form of control, whether reserved or not, over the portion of the premises at issue during the tenancy." *Id.* Thus, "[g]iven the 'bedrock principle' that a lease 'is equivalent to a conveyance for almost all purposes,' and in the absence of evidence showing that the [landlord] had, in fact, retained or exercised any degree of control over any portion of the premises after renting it to the [tenants]," the Law Court concluded that the tenants had exclusive control of the premises. *Id.* ¶ 12 (citation omitted).

This case is distinguishable from *Boles* in a number of ways. First, under the present lease agreement, CMP reserved rights to the premises beyond the mere reservation of access for purposes of repair and inspection—not least, a right to use the premises for public utility purposes that was superior to the "lease rights" of BIW. Second, unlike *Boles*, the summary judgment record in this case contains some evidence that CMP "actually exercised some form of control, ... over the portion of the premises at issue during the tenancy." *Id.* ¶ 10. There are numerous examples of CMP exercising the rights it reserved under the lease as well as accessing and using the parking lot for its own purposes after the property had been leased to BIW. For instance, there is evidence that:

- CMP initiated the process of closing the parking lot to facilitate certain construction projects and upgrades to its substation, Def.'s S.M.F. ¶¶ 7, 12-14;

- On February 4 and 19, 2020, CMP agents entered the premises to evaluate potential obstacles, safety hazards, and outreach needs associated with its upcoming upgrades; Pl.'s S.M.F. ¶¶ 13-14, Def.'s S.M.F. ¶¶ 16- 17, 20;

- Throughout February 2020, project managers, surveyors, and site engineers visited the premises as they needed to conduct planning and other "preliminary type work", Pl.'s S.M.F. ¶ 16; and

- CMP installed a tractor trailer on the premises to use as a mobile office for CMP crews. Pl.'s S.M.F. ¶ 31.

On this record, the court finds that genuine issues of material fact exist as to whether CMP retained some control over the parking lot.

**The entry is**: CMP's motion for summary judgment is **denied**.

The Clerk shall enter this Order upon the docket by reference.

Dated: May 24, 2023

Deborah P. Cashman
Justice, Maine Superior Court

Entered on the docket 6/26/23

9