2008 ME 83

**Robert L. TOLLIVER Jr., as sole
guardian and conservator of
Lucas E. Tolliver**

v.

**DEPARTMENT OF
TRANSPORTATION.**

Supreme Judicial Court of Maine.

Argued: Nov. 5, 2007.

Decided: May 13, 2008.

James M. Bowie, Esq. (orally), Lisa Fitzgibbon Bendetson, Esq., Thompson & Bowie, LLP, Portland, ME, for the Maine Department of Transportation.

Peter J. Rubin, Esq., Daniel J. Mitchell, Esq. (orally), Todd S. Holbrook, Esq., Bernstein Shur, Portland, ME, for Robert S. Tolliver.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: LEVY. MEAD, and GORMAN, JJ.

Concurrence: SAUFLEY, C.J., and CLIFFORD, and ALEXANDER. JJ.

Dissent: SILVER, J.

LEVY, J.

[¶ 1] The Maine Department of Transportation (MDOT) appeals from a judgment entered in the Superior Court (Cumberland County, *Delahanty, J.*) after a jury verdict finding it liable for negligence. MDOT contends that the court erred in (1) finding that it was not immune from suit under the Maine Tort Claims Act, 14 M.R.S. §§ 8101–8118 (2007),[1] and (2) allowing certain expert testimony on the issue of causation. Robert L. Tolliver cross-appeals, contending that the court erred in reducing the damage award against MDOT to $400,000, the maximum amount permitted by 14 M.R.S. § 8105. We vacate the judgment.

## I. BACKGROUND

[¶ 2] In the early morning of June 20, 2004, Caroline M. Knight was driving west on Route 302 in Casco when she struck Lucas E. Tolliver, a pedestrian. The portion of Route 302 where the accident occurred was under construction by MDOT and had recently been repaved. The only markings on the road were yellow reflective markers delineating the center of the road; there were no white edge lines separating the travel lanes from the breakdown lanes. After hitting Lucas, Knight drove away and did not call 911 or notify any other emergency service.

[¶ 3] Lucas sustained serious bodily injuries as a result of the accident, including brain injury. Thereafter, Robert L. Tolliver, as sole guardian and conservator for his son Lucas, filed a complaint alleging negligence on the part of MDOT and Knight. Tolliver's claim against MDOT alleged that MDOT had been negligent in failing to stripe Route 302 in a timely fashion, and in failing to maintain safe conditions on Route 302 through the use of temporary edge line markings.

[¶ 4] Following discovery, MDOT filed a motion for a summary judgment on the grounds of immunity.[2] In its statement of material facts, MDOT stated that the scheduling of striping was within the discretion of its road crew supervisors. As such, MDOT argued that it was entitled to discretionary function immunity on Tolliver's claim that MDOT failed to timely stripe Route 302. The court denied the motion, finding that the acts of the MDOT employee responsible for striping Route 302 were "ministerial as opposed to discretionary."

[¶ 5] During further discovery, MDOT objected to Tolliver's designation of two expert witnesses—Kenneth Burrill and Laurent Lavigne—on the ground that their deposition testimony improperly addressed the causal relationship between the accident and the lack of an edge line. Ultimately, the court ruled that Lavigne would be permitted to testify as to causation and the expectations of MDOT on road construction projects, while Burrill would be permitted to testify as to MDOT guidelines and standard operating procedures.

[¶ 6] A jury trial was held over six days in October 2006. The parties presented the testimony of numerous witnesses addressing the circumstances and investigation of the accident, the schedule

---

1. Title 14 M.R.S. § 8102 (2007) has been amended by P.L.2007, ch. 58, § 3.

2. MDOT also filed a separate motion for a summary judgment on the grounds of causation. In the causation motion, MDOT stated that Tolliver's expert witness Kenneth Burrill was not qualified to testify to causation, and that without his testimony there was no evidence of causation in the record. Burriil was a road construction consultant. The court denied this motion on the ground that "issues of material fact remain[ed] in dispute."

followed by MDOT employees with regard to the repaying of Route 302 in 2004, general operating procedures of MDOT, and the purposes of a white edge line on a road. Tolliver sought to establish that Lucas was walking in the breakdown lane at the time of the accident and that Knight's vehicle struck him from behind. Knight's and MDOT's theory was that Lucas had been walking in the travel lane and, as Knight attempted to safely pass him on the right by traveling in the breakdown lane, Lucas pivoted to his right and walked into the path of the moving vehicle.

[¶ 7] MDOT moved for judgment as a matter of law at the close of Tolliver's case, which the court denied. MDOT thereafter called witnesses to testify to Lucas's activities and level of intoxication on the night of the accident, including expert testimony that, based on blood tests taken at the hospital, Lucas's blood-alcohol level was around .24% at the time of the accident.[3] MDOT also called an expert to testify to MDOT's policies with regard to road striping. At the conclusion of all the evidence, MDOT again moved for judgment as a matter of law, on the issue of proximate cause. This motion was also denied.

[¶ 8] The jury unanimously found that MDOT, Knight, and Lucas were all negligent in causing Lucas's injuries, and that Lucas's negligence was not equal to or greater than the combined negligence of MDOT and Knight, or to the negligence of either of them individually. The jury further found that Lucas's total damages were $3,310,000, but that this amount should be reduced to $2,925,000 in light of

his own negligence. Finally, the jury allocated the fault for Lucas's damages as 35% to MDOT and 65% to Knight. The court thereafter entered the verdict as a final judgment. The court later amended its judgment on MDOT's motion, limiting MDOT's liability to $400,000 of the total damages awarded pursuant to the damages cap established by 14 M.R.S. § 8105.[4] This appeal and cross-appeal followed.

## II. DISCUSSION

[¶ 9] MDOT challenges the court's (A) finding that MDOT was not entitled to discretionary function immunity under the Maine Tort Claims Act (MTCA), and (B) admission of expert witness testimony as it relates to the issue of causation. The MTCA provides that all government entities are "immune from suit on any and all tort claims seeking recovery of damages," subject only to specific exceptions expressed in the Act. 14 M.R.S. § 8103(1). Therefore, we first determine whether MDOT was immune from suit in this case because an affirmative finding would require us to vacate the judgment without inquiry into the expert witness issue.

### A. Discretionary Function Immunity

#### 1. Applicable Statutory Provisions

[¶ 10] MDOT contends that the scheduling of road striping and other matters relating to the maintenance of highways is discretionary by statute. MDOT also contends that the scheduling of striping activities is a matter of policy and discretion,

3. A person is considered legally intoxicated, for purposes of criminal OUI, if that person has a blood-alcohol level of .08% or above. *See* 29–A M.R.S. § 2411(1–A)(A)(2) (2007).

4. Title 14 M.R.S. § 8105 (2007) provides:

1. **Limit established.** In any claim or cause of action permitted by this chapter, the award of damages, including costs, against either a governmental entity or its employees, or both, may not exceed $400,000 for any and all claims arising out of a single occurrence.

and therefore falls within our interpretation of discretionary function immunity.[5]

[¶ 11] "The proper interpretation of a statute is a question of law that we review de novo." *Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 29, 922 A.2d 484, 492. In interpreting a statute, we look first to the plain language of the statute to discern the Legislature's intent. *See Gove v. Carter*, 2001 ME 126, ¶ 13, 775 A.2d 368, 374. "If the statute's meaning is clear, we do not look beyond its words, unless the result is illogical or absurd." *Rodriguez*, 2007 ME 68, ¶ 29, 922 A.2d at 492 (quotation marks omitted).

[¶ 12] The MTCA provides that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages," except as otherwise provided by statute. 14 M.R.S. § 8103(1). Immunity is removed under the Act for claims arising from a governmental entity's performance of "[r]oad construction, street cleaning or repair." 14 M.R.S. § 8104–A(4). This exception to immunity provides:

A governmental entity is liable for its negligent acts or omissions arising out of and occurring during the performance of construction, street cleaning or repair operations on any highway, town way, sidewalk, parking area, causeway, bridge, airport runway or taxiway, including appurtenances necessary for the control of those ways including, but not limited to, street signs, traffic lights, parking meters and guardrails. A governmental entity is not liable for any defect, lack of repair or lack of sufficient railing in any highway, town way, sidewalk, parking area, causeway, bridge, airport runway or taxiway or in any appurtenance thereto.

14 M.R.S. § 8104–A(4).

[¶ 13] This exception to immunity, however, is itself expressly subject to further exceptions. Section 8104–B provides:

*Notwithstanding section 8104–A, a governmental entity is not liable for any claim which results from:*

. . . .

**3. Performing discretionary function.** Performing or failing to perform

---

**5.** Tolliver contends that MDOT's entitlement to discretionary function immunity cannot be reviewed on appeal because "the denial of a motion for summary judgment is not a proper subject for appellate review where ... the case has proceeded to trial or hearing on the merits," and the party has failed to bring an independent motion for judgment as a matter of law to preserve the issue. *Cheung v. Wu*, 2007 ME 22, ¶ 15, 919 A.2d 619, 623 (quotation marks omitted). As support for this contention, Tolliver cites to a First Circuit case finding that this rule applies in the context of a claim of qualified immunity under federal law. *See Rivera–Torres v. Ortiz Velez*, 341 F.3d 86, 92–93 (1st Cir.2003).

*Rivera–Torres* is distinguishable from the present case. The availability of qualified immunity is often closely intertwined with the facts of a case; thus, where there has been a trial, appellate review should be confined to those facts established at trial. *See, e.g., John-*son v. Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); 15A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, *Federal Practice and Procedure*, § 3914.10 at 655–63 (1992). Under the MTCA, however, the availability of discretionary function immunity generally turns on the proper interpretation of the statute, absent a dispute of material fact, and is therefore a question of law. *See Chiu v. City of Portland*, 2002 ME 8, ¶ 17, 788 A.2d 183, 189 ("Whether a defendant is entitled to discretionary function immunity is a question of law ...." (quotation marks omitted)). Because the facts bearing on MDOT's entitlement to discretionary function immunity are not in dispute, it is a question of law subject to de novo review, and is properly preserved on appeal despite MDOT's failure to raise the issue after the court denied its motion for summary judgment.

a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid....

14 M.R.S. § 8104–B(3) (emphasis added).

[¶ 14] We considered the interplay between sections 8104–A and 8104–B in *Norton v. Hall,* 2003 ME 118, 834 A.2d 928. In *Norton,* parents brought claims of negligence and wrongful death against a county sheriff's department and an individual police officer after their two sons were struck and killed by a police vehicle responding to an emergency call. *Id.* ¶¶ 2–4, 834 A.2d at 930. The parents claimed that the department was not immune from suit pursuant to section 8104–A(1)(A), which provides that "[a] governmental entity is liable for its negligent acts or omissions in its ownership, maintenance or use of any ... [m]otor vehicle." *Id.* ¶ 8, 834 A.2d at 931; 14 M.R.S. § 8104–A(1)(A). We disagreed, stating that "*section 8104–B(3) provides a governmental entity with discretionary function immunity despite section 8104–A*" *Norton,* 2003 ME 118, ¶ 11, 834 A.2d at 932 (emphasis added); *see also Carroll v. City of Portland,* 1999 ME 131, ¶ 6 n. 3, 736 A.2d 279, 282 ("Notwithstanding the immunity waiver provisions of section 8104–A, section 8104–B expressly retains certain types of immunity for governmental entities, including discretionary function immunity."). We made clear, however, that section 8104–B(3) would not immunize "the everyday non-discretionary operation of governmental motor vehicles, such as routine patrolling." *Norton,* 2003 ME 118, ¶ 14, 834 A.2d at 932.

[¶ 15] Based on the foregoing analysis, if Tolliver can prove that MDOT was negligent in its striping of Route 302, thereby showing that the road construction waiver

provision of 8104–A(4) is applicable, MDOT is not immune from suit *unless* the decision of when to stripe the road was a discretionary function. With this statutory framework in mind, we turn to examine whether MDOT is entitled to discretionary function immunity.

2. Discretionary Function Immunity

[¶ 16] "Whether a defendant is entitled to discretionary function immunity is a question of law...." *Chiu v. City of Portland,* 2002 ME 8, ¶ 17, 788 A.2d 183, 189 (quotation marks omitted). Discretionary function immunity arises by operation of statute, and thus we look first to the plain language and purpose of the entire statutory scheme to determine whether it immunizes the governmental acts at issue in a given case. *See York Ins. of Me., Inc. v. Superintendent of Ins.,* 2004 ME 45, ¶ 14, 845 A.2d 1155, 1159.

[¶ 17] Section 8104–B provides immunity not only for discretionary functions, but also for legislative acts, judicial acts, prosecutorial functions, and activities of state military forces. 14 M.R.S. § 8104–B(1)–(5). The nature of these five categories of immunity in section 8104–B establishes that it is intended to provide absolute immunity for acts that are uniquely governmental. The discretionary function immunity established in subsection (3), like the legislative, judicial, prosecutorial, and state military immunities set forth in the remaining subsections, "serves the important purpose of separation of power by preventing the judicial branch from entertaining tort actions as tools for manipulating important policy decisions that have been committed to coordinate branches of government." *Adriance v. Town of Standish,* 687 A.2d 238, 240 (Me. 1996).

[¶ 18] The notion that the purpose of discretionary function immunity is to pro-

tect the separation of powers on important policy questions is supported by our case law on the subject, as well as U.S. Supreme Court precedent. In *Dalehite v. United States*, the Supreme Court interpreted the discretionary function immunity provision of the Federal Tort Claims Act for the first time, and found that it would bar recovery for injuries sustained when a shipment of fertilizer involved in a governmental export program exploded aboard a ship, causing great loss of life and property. 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).[6] In so deciding, the Court examined the legislative history of the discretionary function immunity provision and explained:

> [W]hile Congress desired to waive the Government's immunity from actions for injuries to person and property occasioned by the tortious conduct of its agents acting within their scope of business, it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function.

*Id.* at 27–28, 73 S.Ct. 956. In light of the purpose of discretionary function immunity, the Supreme Court concluded that the specific acts of negligence by governmental employees alleged by the plaintiffs were immune from suit because they were "performed under the direction of a plan developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department." *Id.* at 39–40, 73 S.Ct. 956. Accordingly, they were the kind of uniquely governmental actions to which discretionary function immunity applied. *Id.* at 42, 73 S.Ct. 956.

[¶ 19]  We have employed a four-factor test to aid in determining when discretionary function immunity applies:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 426 (Me.1987) (quotation marks omitted). In *Darling*, we found that the commissioner and superintendent of a state mental health facility were entitled to discretionary function immunity from claims that they "negligently devised and oversaw [the facility's] policies governing the commitment and release of patients." *Id.* Further, the employees responsible for carrying out these policies, as well as other duties imposed by statute and expressly granting the employees discretion in their actions, were also entitled to immunity. *Id.* at 426–29. As in Dalehite, our decision in Darling turned on the fact that the alleged negligence was associated with a plan or policy developed at a high level of government.

[¶ 20]  Similarly, we have found that government employees were entitled to

---

**6.** The fertilizer was produced pursuant to a plan developed by the War Department to supply fertilizer to occupied Germany, Japan, and Korea in 1946. *Dalehite v. United States*, 346 U.S. 15, 19–20, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). A basic ingredient of the fertilizer was ammonium nitrate. *Id.* at 21, 73 S.Ct. 956.

discretionary function immunity where the alleged negligent acts involved discretionary decisions that were integral to the accomplishment of a uniquely governmental policy or program. In *Roberts v. State,* 1999 ME 89, ¶ 10, 731 A.2d 855, 857–58, we determined that the decision within a correctional facility of when to order a prisoner back to his cell involved a discretionary function because it was integral to a basic governmental corrections program. *See also Norton,* 2003 ME 118, ¶¶ 7–9, 834 A.2d at 931 (decisions of police officer in responding to an emergency are actions entitled to discretionary function immunity because they "serve[] the basic governmental objective of public safety").

■ [¶ 21] In contrast, we have made it clear that discretionary function immunity is not available for "ministerial acts." *See Carroll,* 1999 ME 131, ¶ 9, 736 A.2d at 283. "Ministerial acts are those to be carried out by employees, by the order of others or of the law, with little personal discretion as to the circumstances in which the act is done." *Id.* (quotation marks and alteration omitted) (providing that the third factor of the· discretionary function immunity test helps to determine whether an act was ministerial or discretionary). In other words, "in cases where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action." *Rodriguez,* 2007 ME 68, ¶ 22, 922 A.2d at 490 (quotation marks and alterations omitted); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 1040 (5th ed.1984) (distinguishing between planning-level decisions that are entitled to immunity and operational-level decisions that are not).

[¶ 22] Accordingly, we have found that the decision by a government employee whether to open or close the gates surrounding a municipal trash hopper did not involve formulation of a basic governmental policy nor was a statutory obligation of the attendant. *Adriance,* 687 A.2d at 241–42. It was therefore not an act entitled to discretionary function immunity. *Id.* We have also found that where a town clerk elected not to install a handrail on the steps to her home, at which she was required to conduct official town business, the Town was not entitled to discretionary function immunity. *Rodriguez,* 2007 ME 68, ¶¶ 23–24, 922 A.2d at 490–91. We reasoned that the decision of whether to install a handrail more closely resembled one made by people generally because it served no other governmental policy or purpose and that "operational decisions, such as those regarding the safety or maintenance of premises, fall outside the scope of discretionary function immunity." *Id.* ¶ 23, 922 A.2d at 490. Further, expanding the reach of discretionary function immunity to the facts of *Rodriguez* would allow "government officials [to] be immune from suit for allowing the persistence of hazardous conditions on property that they are required to maintain." *Id.* ¶ 23, 922 A.2d at 490–91.

■ [¶ 23] In the present case, the actions of the MDOT employees responsible for laying down and striping the edge line of Route 302 were not the kind of governmental policy decisions or judgments to which discretionary function immunity was intended to apply. There is no indication, as suggested by the concurrence, that these employees were involved in the careful weighing of competing public policy considerations when determining when to complete the striping of the road and whether to use temporary edge line markings. Instead, they were acting as all

employees—governmental or nongovernmental—would in assessing the logical and most efficient way to complete a road improvement project. Although their decisions may have had an indirect effect on the State budget, there is no basis in either the language of the MTCA or our past decisions interpreting discretionary function immunity to conclude that such a fact should convert an otherwise ministerial act to one involving the formulation of governmental policy. We must construe sections 8104–A and 8104–B in a manner that will produce coherent results when applied to an act as basic as when to paint the line on a newly paved road.

[¶ 24] Nevertheless, MDOT argues that the scheduling of road striping has been made discretionary by 23 M.R.S. § 1351 (2007), which states:

> [MDOT] shall have authority to install and maintain traffic control signals, warning, regulatory, directional and informational signs and markings, on all state and state aid highways and highways constructed under its direction with federal funds, when, in its opinion, such signs, signals and markings are necessary for public safety and convenience.

The language of the statute establishes that it is within MDOT's authority to decide where and what traffic control devices are necessary on state highways. These initial decisions regarding the need for traffic control devices on specific roads are discretionary in nature, and MDOT may be immune for such planning-level decisions. When, however, MDOT has determined that traffic control devices, such as white edge lines, are necessary for the public safety, the implementation of that decision on a day-to-day operational level is no longer discretionary, but rather is a ministerial act carried out by MDOT employees.

[¶ 25] Finally, to apply section 8104–B(3)'s discretionary function immunity to the facts of this case, as urged by the concurrence, would render section 8104–A meaningless. Negligence in the course of road repair is one of the express exceptions to immunity in section 8104–A. 14 M.R.S. § 8104–A(4). Treating operational decisions by lower level administrators as protected by discretionary function immunity under 8104–B(3), after the policy decision to undertake a road repair has been made, would afford immunity to virtually every aspect of what the Legislature intended to be a non-immune activity, thus eviscerating section 8104–A(4). Tolliver's claim in this case is not based upon MDOT's decision to undertake a road improvement project on Route 302; that initial policy decision would be entitled to discretionary function immunity as expressly contemplated by the second sentence of section 8104–A(4). However, once MDOT has exercised its discretion by deciding to undertake a road improvement project, section 8104–A(4) requires MDOT to complete that project in a non-negligent manner. The interpretation advanced in Justice Alexander's concurrence would circumvent this requirement. To apply discretionary function immunity to the everyday decisions of a road crew supervisor regarding whether to paint the edge line and whether to use temporary edge line markings would render the express language of section 8104–A(4) meaningless.

[¶ 26] There is no question that MDOT had, in the exercise of its discretion, determined that white edge lines were necessary on Route 302 to delineate the breakdown lanes. However, the MDOT employees responsible for implementing the decision by laying out, scheduling, and painting the edge lines did not have the kind of discretion that is necessary for a government entity to claim the benefit of

discretionary function immunity—they were simply required to stripe Route 302 in a reasonable manner. The trial court did not err in so concluding.

## B. Admissibility of Expert Witness Testimony on Causation

[¶ 27] MDOT argues that the court erred in admitting certain expert testimony. Specifically, MDOT challenges the testimony of Laurent Lavigne and Sergeant James Estabrook as it relates to causation.

### 1. Applicable Legal Standards

[¶ 28] The Maine Rules of Evidence provide:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

M.R. Evid. 702. To be admissible, "the expert must be able to provide some insight beyond the kind of judgment an ordinarily intelligent juror can exert." Field & Murray, *Maine Evidence* § 702.2 at 350 (2000 ed.1999). "The qualification of an expert witness and the scope of his opinion testimony are matters within the discretion of the trial court." *State v. Tibbetts,* 572 A.2d 142, 143 (Me.1990) (quotation marks and alteration omitted).

[¶ 29] We have established a two-part test, originally articulated in *State v. Williams,* 388 A.2d 500, 504 (Me. 1978), for determining when expert testimony is admissible: "A proponent of expert testimony must establish that (1) the testimony is relevant pursuant to M.R. Evid. 401, and (2) it will assist the trier of fact in understanding the evidence or determining a fact in issue." *Searles v.* *Fleetwood Homes of Pa., Inc.,* 2005 ME 94, ¶ 21, 878 A.2d 509, 515–16. Further, to meet the two-part test, "the testimony must also meet a threshold level of reliability." *Id.* ¶ 22, 878 A.2d at 516 (quotation marks omitted). This is because "[i]f an expert's methodology or science is unreliable, then the expert's opinion has no probative value." *State v. Irving,* 2003 ME 31, ¶ 12, 818 A.2d 204, 208. We review a court's finding that an expert's testimony is sufficiently reliable for clear error. *Searles,* 2005 ME 94, ¶ 24, 878 A.2d at 516. With these standards in mind, we turn to consider the testimony of each expert challenged by MDOT on appeal.

### 2. Laurent Lavigne

[¶ 30] Lavigne was designated as an expert witness by Tolliver, and testified that he was currently working as a road construction consultant. Lavigne testified that he had previously worked for a paving company that performed road construction in Maine, including paving and striping activities. He graduated from college around 1965 with a degree in civil engineering with a major in transportation. Since then, he has worked on numerous highway construction projects, many of which involved striping and paving. Lavigne testified that while he was working in Maine, his company was the MDOT subcontractor responsible for striping on some state road projects, and that when his company was responsible for doing the striping on a road, MDOT expected that it be done within two or three days, a week at the most. He also stated that when MDOT itself was doing the striping on the road, as opposed to using a subcontractor, it usually completed the striping within two days to a week after paving on a job had been completed. Lavigne testified that the reason why it was important to get the striping done within this timeframe

was primarily the safety of drivers and pedestrians.

[¶ 31] After Lavigne had testified to his experience working on highway construction projects in general, and specifically as an MDOT subcontractor, Tolliver asked Lavigne if, "based upon [his] training, education, experience and [his] examination of the site conditions at the scene of the accident," he had "an opinion as to whether or not the failure of [MDOT] to stripe the fog line or sideline prior to the accident on June 20th was a substantial contributing factor in causing the accident." MDOT's objection to the question was overruled, and Lavigne stated that he believed the lack of an edge line would be confusing to drivers and pedestrians in general. He then stated, over MDOT's objection, that he believed the lack of an edge line was "a substantial contributor to the accident."

[¶ 32] On cross-examination, Lavigne admitted that he had visited the accident site only once and had only basic knowledge of the area in which the accident occurred. He also stated that he did not take Lucas's inebriation or Knight's account of the accident into consideration when forming his opinion. On redirect, Lavigne testified that it would be more important that there be a line delineating the breakdown lane for a person who had been drinking than for someone else. MDOT's objection to this testimony was overruled.

[¶ 33] MDOT contends that Lavigne was not qualified to testify that the lack of an edge line was a substantial contributing factor to the accident in this case. We agree.

[¶ 34] Lavigne's experience, training, and education qualified him as a road construction expert with knowledge of MDOT's standards and operating procedures. He was, therefore, qualified to testify as to MDOT's usual timeframe for striping a road, based on his experience with this department. He was also qualified to testify, based on his education and experience, that edge lines are important on roadways for the safety of the public and pedestrians. This is the kind of knowledge a road construction expert would generally possess.

■■■ [¶ 35] It is clear, however, that Lavigne lacked the foundation necessary to offer an opinion as to the cause of *this particular accident.* He had limited knowledge about the accident scene and the condition of the individuals involved in the accident. He was not an accident reconstructionist whose training and experience would allow him to make scientifically reasonable and supportable conclusions about causation based on a careful examination of the accident scene. Lavigne's training and experience may have permitted him to opine that the lack of an edge line created an unsafe condition that was a *possible* cause of the accident, but not that it was a proximate cause of the accident. The mere possibility of causation is not enough to establish *proximate* cause, or, in Lavigne's words, "substantial contribut[ion]." *See Merriam v. Wanger,* 2000 ME 159, ¶ 8, 757 A.2d 778, 780–81. Lavigne's opinion that the lack of an edge line substantially contributed to the accident was speculation and did not assist the jury; rather, it infringed on the function and role of the jury. For these reasons, the court erred in admitting Lavigne's testimony regarding causation.

### 3. Sergeant James Estabrook

[¶ 36] Tolliver called Sergeant Estabrook as an expert witness at trial. As part of Estabrook's training after joining the sheriff's department, he received instruction in basic accident investigation

techniques, and had investigated hundreds of accidents in the course of his career. He acknowledged, however, that he was not an accident reconstructionist and that he believed an accident reconstructionist was necessary to investigate the cause of the accident involving Tolliver.[7]

[¶ 37] Estabrook testified that he had been on patrol on Route 302 in the days prior to the accident, and had observed vehicles traveling at high rates of speed in what he knew to be the breakdown lane. His testimony that, based on his observations, he believed that the lack of an edge line could have been a contributing factor in the accident was objected to by MDOT and ordered stricken by the court. MDOT did not also ask for a curative instruction or move for a mistrial at that time.

[¶ 38] MDOT asserts that "Estabrook was not qualified to address causation. Nonetheless, he was allowed [to] opine that the lack of a side edgeline was a possible contributing factor in the accident." However, our examination of Estabrook's testimony establishes that Estabrook was not, in fact, permitted to testify that the lack of an edge line was a contrib-

uting factor to the accident. Indeed, the court sustained MDOT's objection and ordered the testimony stricken.[8] Accordingly, we find no error with regard to Estabrook's testimony.

### 4. Harmless Error Analysis

[¶ 39] Our finding that Lavigne's expert testimony was erroneously admitted does not automatically require that we vacate the judgment. We will not disturb a judgment if an error is harmless. M.R. Civ. P. 61; *see also* MR. Evid. 103(a); *DiPietro v. Boynton*, 628 A.2d 1019, 1024 (Me.1993). A preserved error will be treated as harmless if it is highly probable that the error did not affect the judgment *See Bennett v. Forman*, 675 A.2d 104, 106 (Me.1996).

[¶ 40] In the present case, it is not highly probable that the admission of Lavigne's testimony that the lack of an edge line was "a substantial contributor to the accident" did not affect the judgment. His opinion that the absence of the edge line was "a substantial contributor to the accident" closely foreshadowed the court's jury instruction that to prove proximate

---

7. Estabrook testified that his training and experience did allow him to draw general conclusions about the circumstances of an accident, including the relative locations and travel directions of vehicles and people involved in automobile accidents. Estabrook testified that he believed Lucas had been struck by the left front corner of Knight's vehicle, and that Lucas had likely been walking in the breakdown lane with his back to Knight when he was struck. He stated that he drew these conclusions from the scuff marks, skid marks, debris field, and the resting place of Lucas's body at the scene of the accident. MDOT did not object to the admission of this testimony.

8. The relevant portions of Estabrook's testimony are as follows:

   Mr. Rubin: Sergeant Estabrook, I take it from the time of your deposition to today, you formed an opinion as to whether or not the lack of a side line—painted side line was a contributing factor to the accident; is that true?

   Mr. Estabrook: It's possible it could have been a factor, yes.

   Mr. Wright: The question called for a yes or no answer. I didn't have any opportunity to interpose an objection.

   Court: The objection is sustained. The answer is stricken.

   . . . .

   Mr. Rubin: Based upon what you said previously, I would now ask for his opinion as to whether or not the lack of a white painted stripe on the road contributed to the accident.

   Mr. Wright: I will object. He has given us nothing else.

   Mr. Rubin: No further questions, Your Honor.

cause, it must be shown that "the act or failure to act played a substantial part in bringing about or actually causing the injury or damage."[9] Although an expert witness's testimony may generally "embrace[ ] an ultimate issue to be decided by the trier of fact," M.R. Evid. 704, such an opinion is permissible only if the testimony satisfies all the requirements for admissible expert testimony, *see Castine Energy Constr., Inc. v. T.T. Dunphy, Inc.*, 2004 ME 129, ¶ 13, 861 A.2d 671, 677. Lavigne's testimony on causation did not satisfy this foundational test. There is a high degree of probability that his testimony embracing an ultimate issue affected the jury's evaluation of, and ultimate finding on, the element of proximate cause.

[¶ 41] Therefore, we vacate the judgment because the admission of Lavigne's expert opinion was not harmless. However, whether we remand for a new trial or for judgment in favor of MDOT turns on whether Tolliver otherwise presented sufficient additional evidence on proximate cause such that a fact-finder could reasonably conclude that the lack of an edge line on Route 302 was a proximate cause of the accident in this case. We turn to examine this issue.

5. Evidence of Proximate Cause

■■■■■■ [¶ 42] "A judgment as a matter of law is improper if any reasonable view of the evidence could sustain a verdict for the opposing party." *Merriam*, 2000 ME 159, ¶ 7, 757 A.2d at 780 (quotation marks omitted). The question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is

generally a question of fact, reserved for the jury's determination. *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759. We have consistently explained that the principle of proximate cause contains two elements, substantiality and foreseeability:

> Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence.

*Merriam*, 2000 ME 159, ¶ 8, 757 A.2d at 780–81. Although a jury is not permitted to find proximate cause based only on speculation, it does not follow that jurors are prohibited from drawing reasonable inferences based on their own experience as to whether a particular act or omission is a proximate cause of an injury. *See id.* ¶¶ 16–17, 757 A.2d at 782; W. Page Keeton, Prosser & Keeton on The Law of Torts 270 (5th ed. 1984) ("If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relationship exists."); *see also Marcoux v. Parker Hannifin/Nichols PortlandDiv.*, 2005 ME 107, ¶¶ 25–26, 881 A.2d 1138, 1146. Our precedents also indicate that in cases involving complex facts beyond the ken of the average juror, or those potentially involving multiple causes, more

9. The court's instructions to the jury on proximate cause included the following language: Now, ladies and gentlemen, it is not enough that the plaintiff prove to you that he did in fact incur the injury or damages claimed. The plaintiff must also prove that the negligence of the defendants was the proximate or legal cause of the injury or damage claimed. . . . An injury or damage is legally caused by an act or by a failure to act whenever the act or failure to act played a *substantial part in bringing about or actually causing* the injury or damage.

substantial evidence of proximate cause may be required.[10]

■ [¶ 43] In the present case, Tolliver presented substantial evidence that the purpose of the white edge line of a road was, at least in part, to make the road safer for drivers and pedestrians. Lavigne testified to this fact, as did an MDOT traffic engineer called by MDOT. Further, the toxicologist called by MDOT testified to the process of tracking, whereby a driver or pedestrian uses markers in the road to help stay in the proper lane of travel.[11] Although Tolliver argues that this evidence allows an inference of causation, this evidence more accurately establishes the foreseeability component of proximate cause, but not the substantiality component of proximate cause. Given the conflicting and inconsistent theories of what caused the accident in this case, such evidence regarding foreseeability does not support an inference that the lack of an edge line played a substantial part in bringing about or actually causing the accident that resulted in Lucas's injuries.

[¶ 44] We conclude that any inference that the lack of an edge line was an actual cause of the accident would amount to nothing more than speculation on the part of the jury. Although he testified to his damages, Lucas was unable to give his account of the circumstances of the accident because he had no memory of it. Therefore, Knight was the only eyewitness able to testify about the accident. Although the jury was free to disregard her arguably self-serving version of events, any additional testimony the jury received regarding what *actually* happened came from expert testimony, and not a single qualified expert concluded that the lack of an edge line was a substantial contributor to this accident. The testimony regarding the need for an edge line for safety purposes established that the accident was *foreseeable*, and the jury was permitted to conclude as such. However, to allow the jury to also infer actual causation from the conflicting and inconclusive evidence in this case, from expert and lay witnesses alike, would be to replace fact-finding with sheer conjecture.

[¶ 45] For the foregoing reasons, we conclude that MDOT was entitled to judgment as a matter of law in its favor. Accordingly, we do not address Tolliver's cross-appeal regarding the measure of damages.

The entry is:

Judgment vacated. Remanded for entry of judgment for MDOT.

---

10. For example, in a medical malpractice case, numerous expert witnesses testified that the plaintiff was suffering from a serious medical condition when she arrived at the emergency room and was examined by the defendant physician. *Merriam v. Wanger,* 2000 ME 159, ¶ 12, 757 A.2d 778, 781. There was also expert testimony that the plaintiff should have been hospitalized to allow for additional tests to be done or referred to a surgeon for further evaluation, and the failure to do so created a reasonably foreseeable risk that the plaintiff would suffer the further harm she did, in fact, experience. *Id.* We expressly noted, however, that no expert testified that the plaintiff's "damages would have been avoided had [the defendant] acted properly." *Id.* ¶ 15, 757 A.2d at 782. In finding that the judgment for the plaintiff should be vacated and judgment entered for the defendant, we stated that "[a]lthough there may be multiple causes of any one injury, the existence of multiple possibilities makes the need for evidence of [the defendant's] responsibility for causation all the more important." *Id.* ¶ 18, 757 A.2d at 782.

11. She also testified, however, that in the absence of a painted white line, a pedestrian could use other markings, such as the edge of the pavement, for guidance.

ALEXANDER, J., with whom SAUFLEY, C.J., and CLIFFORD, J., join, concurring.

[¶ 46] I concur with the Court that we must vacate the Superior Court's judgment in this matter. In support of the decision to vacate, I concur with the Court's analysis of the expert witness issue in Part B, subparts 1–4, of the Court's opinion. I do not join the Court's analysis of the discretionary function immunity issue in Part A of its opinion, including its determination that government priority setting, scheduling, and resource allocation decisions are ministerial acts rather than discretionary decisions pursuant to 14 M.R.S. § 8104–B(3) (2007).

[¶ 47] I agree with the Court that the act of repainting the fog line, separating the travel lane from the breakdown lane, is a ministerial act. I also agree with the Court that the decision as to whether this road, with a breakdown lane, needs a fog line is a ministerial decision. But those decisions are not the decisions at issue in this case.

[¶ 48] The road in question, Route 302, was subject to an ongoing reconstruction and repaving project. No one suggests that while this project was ongoing, the Maine Department of Transportation (MDOT), or its contractors, were obligated to replace the fog line every day or night. Once the construction project was deemed complete, fog line replacement is not something that must occur instantly. MDOT, a government agency with limited staff and resources, must be accorded a reasonable time within which to complete repainting the fog line after the completion of construction.

[¶ 49] Here, several discretionary decisions, unique to the functions of MDOT as a government agency, were required prior to replacement of the fog line. The first decision, and one about which the record is unclear, is whether, or not, the construction and repaving project was complete. Before MDOT decided, as a matter of discretion, that the construction and repaving project was complete or at least sufficiently complete to replace the fog line, MDOT had no obligation to replace the fog line. Once MDOT had decided that the construction and repaving project was complete, it then would have discretion to schedule replacement of the fog line within a reasonable time, considering: the time it takes new asphalt pavement to cure before painting is appropriate; MDOT's staff and resources available to replace the fog line; the competing needs of other projects to be served by the available staff and road lining equipment; and imponderables such as weather. A relining project, even in the summer, could be appropriately deferred if rains were anticipated at a time that would cause the relining to be completed in a less than satisfactory manner.

[¶ 50] Discretionary function immunity extends to protect "determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 425–26 (Me.1987),[12] (quoting *Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)). The planning and scheduling of relining operations, once repaving was complete and the asphalt was sufficiently cured, is the essence of discretionary deci-

12. *Darling* involved an issue of discretionary function immunity for employees pursuant to 14 M.R.S.A. § 8111(1)(C) (1987), but the language of the statute and the discretionary function immunity analysis are the same for an issue presented pursuant to section 8104–B(3).

sion-making protected by section 8104–B(3).

[¶ 51] Our most recent review of the discretionary immunity issue occurred in *Rodriguez v. Town of Moose River*, 2007 ME 68, 922 A.2d 484. There, we reviewed whether a decision of a town clerk to replace a handrail on a stairway to her home, when the home also served as the town office, was protected by the employee discretionary function immunity provisions of the Maine Tort Claims Act, 14 M.R.S. § 8111(1)(C) (2007). *Rodriguez*, 2007 ME 68, ¶¶ 18–26, 922 A.2d at 489–92. We held that the town clerk's decision to replace, or not to replace, the previously removed handrail was not a discretionary decision. To support this conclusion, we held that "[in] cases where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action." *Id.* ¶ 22, 922 A.2d at 490 (quoting *Adriance v. Town of Standish*, 687 A.2d 238, 241 (Me., 1996)). Thus, we observed that choices regarding the performance of routine maintenance that are similar or identical to choices made by people generally in society are not entitled to discretionary function immunity.

[¶ 52] The decisions regarding when to replace the fog line after a construction and repaving project are discretionary decisions very different than the decisions or activities carried on by people generally in the private sector. *See Rodriguez*, 2007 ME 68, ¶ 22, 922 A.2d at 490. The decisions here involve priority setting, planning, and scheduling of government operations that are essential discretionary functions. *See Darling*, 535 A.2d at 425–26. Accordingly, I would hold that the decisions as to whether the construction and repaving project was complete, whether the new paving was sufficiently cured, and, if so, when to schedule and commit resources, within a reasonable time, to replace the fog line, are inherently discretionary decisions, unique to the functions of MDOT as a government agency and subject to discretionary function immunity pursuant to the Maine Tort Claims Act, 14 M.R.S. § 8104–B(3). For this reason, I would vacate the judgment of the Superior Court.

SILVER, J., dissenting in part and concurring in part.

[¶ 53] I agree that MDOT is not entitled to discretionary function immunity and concur in Part A of the Court's opinion, but disagree that the court erred in admitting the expert testimony of Laurent Lavigne, and I therefore respectfully dissent with respect to Part B. I would affirm the jury verdict in favor of Tolliver. Because the issue of Lavigne's testimony ultimately turns on weight rather than admissibility, a distinction the majority fails to make, I would affirm the court's admission of his testimony that the lack of an edge line was a substantial cause of the accident.

A. Lavigne's Expert Witness Testimony

[¶ 54] Lavigne testified he had forty years of experience as a civil engineer working on road construction of major highway projects and nearly as many years working in paving and striping activities. Lavigne's roles were primarily supervisory, including project engineer, superintendent, regional manager, and vice president of operations. Although the vast majority of Lavigne's experience was with projects outside the State of Maine, he testified that the standard throughout most states is the same; that line striping should be done within two or three days,

no longer than a week after the paving of the surface course.

[¶ 55] While employed as the regional manager for Barrett Paving in Bangor from 1999–2004, Lavigne supervised thirteen highway construction projects with the State of Maine Department of Transportation. Lavigne testified that the MDOT required that line striping be done within two to three days, and no longer than a week, after the completion of the surface course, to ensure the safety of the pedestrian and driving population. He further testified that he visited the accident site and took photos; he reviewed construction consultant Ken Bun-ill's report; and that in his opinion, the lack of an edge line was "a substantial contributing factor" to the accident.

[¶ 56] According to *State v. Williams,* the seminal case on the admissibility of the testimony of expert witnesses, and its progeny, it is the judge's role to act as the gatekeeper to determine admissibility and the jury's role to determine the weight of expert testimony. 388 A.2d 500, 504–05 (Me.1978) (holding that as long as the proffered expert is qualified, the controlling criteria regarding admissibility is whether in the sound judgment of the presiding Justice the testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue). We review a court's finding that an expert's testimony is sufficiently reliable for clear error. *Searles v. Fleetwood Homes of Pa., Inc.,* 2005 ME 94, ¶ 24, 878 A.2d 509, 516. The clear error standard is highly deferential. "The trial judge has the best vantage point to make judgments on issues such as credibility. The appellate court's cold transcript is a pale substitute. As such, the facts are considered to be the sole province of the judge or jury." Hon. Andrew M. Mead, *Abuse of Discretion: Maine's Application of A Malleable*

*Appellate Standard,* 57 Me. L.Rev. 519, 524 (2005). Further, we afford a trial court wide discretion to determine whether the danger of unfair prejudice posed by relevant evidence substantially outweighs the value of proffered evidence under M.R. Evid. 403. *See State v. Millay,* 2001 ME 177, ¶ 11, 787 A.2d 129, 131–32; *Todd v. Andalkar,* 1997 ME 59, ¶ 6, 691 A.2d 1215, 1217.

[¶ 57] The Maine Rules of Evidence provide:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

M.R. Evid. 702.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

M.R. Evid. 703.

[¶ 58] Lavigne's testimony was clearly admissible because his qualifications as a road construction expert and his knowledge of the safety purposes underlying edge lines on roads were established at trial. The touchstones of admissibility, namely (1) whether his testimony was relevant, and (2) whether it was useful to the jury in understanding the evidence or determining a fact in issue, *see id,* were clearly satisfied here. *Cf. Castine Energy Const., Inc. v. T.T. Dunphy, Inc.,* 2004 ME 129, ¶¶ 13–14, 861 A.2d 671, 677 (former state trooper permitted to testify with re-

gard to trucking safety issues because "he had extensive experience with enforcing safety regulations" and his "knowledge was useful with respect to safety standards and issues").

[¶ 59] Federal case law also favors the admissibility of the evidence. F.R. Evid. 702 is identical to M.R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.,* the Supreme Court held that expert testimony is admissible only if it is both relevant and reliable, and assigned trial judges the role of gatekeepers. 509 U.S. 579, 590–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court has reaffirmed these principles many times. *See, e.g., Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238(1999).

[¶ 60] The Court in *Kumho* Tire expanded Daubert's general holding, setting forth the trial judge's gatekeeping function, to apply to testimony based on technical and other specialized knowledge in addition to scientific knowledge. 526 U.S. at 147–48, 119 S.Ct. 1167. The Court quoted Judge Learned Hand, who explained that the role of experts, not just scientific experts, is to help the jury understand principles or theories that are beyond life's common experiences: "Experts of all kinds tie observations to conclusions through the use of ... 'general truths derived from ... specialized experience.'" *Id.* at 148, 119 S.Ct. 1167. Judge Hand further observed that the expert's specialized experience will be "confessedly foreign in kind to [the jury's] own." *Id.* at 149, 119 S.Ct. 1167. Kumho Tire linked Judge Hand's insights to the current role of the trial courts: "The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge." *Id.*

[¶ 61] In *United States v. Salimonu,* a criminal case in which the defendant used a code name to illegally import drugs, the First Circuit affirmed a district court's decision to exclude a linguistic expert's testimony. 182 F.3d 63 (1st Cir.1999). Voir dire revealed that the witness had no training in voice recognition, had engaged in voice recognition only two or three times before, did not know whether the voices on the tapes had been disguised, and that a lay person without linguistics training would be able to discern the same differences in the tapes, if any, that he had found. *Id.* at 73. Relying on *Kumho Tire,* the First Circuit held that the district court properly exercised its sound discretion to exclude the linguistic expert's testimony because the opinion lacked any indicia of reliability. *Id.* at 74.

[¶ 62] Contrary to the testimony proffered by the expert in Salimonu, Lavigne's testimony offered many indicia of reliability, including his decades of experience as an engineer and supervisor on road construction projects, his firsthand knowledge of the accident site, and his unique expertise as a consultant to MDOT paving and striping projects. *See id.* There is no question that Lavigne's knowledge as to the requisite MDOT paving/striping timeframe and its implications on safety for both pedestrians and vehicles were clearly "specialized" and "foreign" to that possessed by the jury. *See Kumho Tire,* 526 U.S. at 149, 119 S.Ct. 1167.

[¶ 63] It was therefore appropriate for the judge in this case to admit Lavigne's testimony and then allow the jury to determine whether the lack of striping was in fact a proximate cause of this particular accident. The existence of proximate cause is a question of fact, not law, *see, e.g., Grover v. Boise Cascade Corp.,* 2003

ME 45, ¶ 11, 819 A.2d 322, 324, and further, it is permissible for "an expert to testify regarding factual issues that also concern legal standards." *Castine Energy*, 2004 ME 129, ¶ 15, 861 A.2d at 677.

[¶ 64] Contrary to the majority's contention that Lavigne's testimony was speculative and therefore infringed on the role of the jury, the primary purpose of witness testimony is to provide the fact-finder with an opportunity to weigh competing evidence from different perspectives. To prevent a witness with the credentials and expertise of Lavigne from testifying altogether, however, would be a considerable impediment to plaintiffs seeking justice. Cross-examination allows opposing counsel to demonstrate to the jury that an expert witness's opinion should not be accorded significant weight if, for example, as in this case, the witness lacked knowledge of the victim's state of intoxication or the tortfeasor's story of how the accident was caused.

B. Proximate Cause

[¶ 65] The majority also errs in finding that Tolliver failed to otherwise present sufficient evidence on proximate cause such that a reasonable fact-finder could conclude that the lack of an edge line was a proximate cause of the accident in this case. Because there is ample evidence, even absent Lavigne's testimony, to support a finding of proximate cause by the jury, I would affirm the trial court's denial of MDOT's motion for judgment as a matter of law.

[¶ 66] We review the denial by the trial court of a motion for a judgment as a matter of law "to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict." *Kaechele v. Kenyon Oil Co., Inc.*, 2000 ME 39, ¶ 17, 747 A.2d 167, 173 (citations omitted); *see also Houde v. Millett*, 2001 ME 183,

¶ 11, 787 A.2d 757, 759 (the question of proximate cause is a question of fact, and "a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause").

[¶ 67] The testimony given by Stephen Landry, the MDOT traffic engineer, that the edge line is intended as a safety measure for vehicles and pedestrians, and Karen Simone, the MDOT toxicologist, about the process of "tracking," whereby a driver or pedestrian follows some form of marker on the road, in order to stay in their lane of travel, support the conclusion that the presence of an edge line would have assisted both Ms. Knight in staying out of the breakdown lane and Mr. Tolliver in staying further away from the travel lane. Sgt. Estabrook testified that, on the days preceding the accident, he observed vehicles traveling at high rates of speed on Route 302, in what he knew to be the unstriped breakdown lane, which was atypical, further supporting Tolliver's conclusion that the lack of an edge line created greater confusion for drivers, including Ms. Knight.

[¶ 68] The court's denial of the MDOT's motion should be upheld if there is "any reasonable view of the evidence" that would support the jury's verdict. *Kaechele*, 2000 ME 39, ¶ 17, 747 A.2d at 173. The evidence presented by Landry, Simone, and Estabrook was clearly sufficient for the jury to conclude that the MDOT's failure to apply an edge line within a reasonable timeframe was a proximate cause of Tolliver's injuries. The majority seeks to circumvent the jury's verdict for the plaintiff by taking away both the trial judge's and jury's discretionary powers in this case for reasons that are unclear.

C. Discretionary Function Immunity

[¶ 69] I also write separately to address the arguments raised in the concur-

ring opinion. Painting fog lines on roads does not require any particular expertise that is unique to the function of a government entity, in this case, MDOT. As Lavigne's testimony demonstrates, his four decades of experience with road construction brought him around the country paving and striping roads with both governmental and non-governmental entities, with the same processes and results, regardless of the entity in charge.

[¶ 70] As our holdings in *Rodriguez v. Town of Moose River*, 2007 ME 68, 922 A.2d 484 and *Adriance v. Town of Standish*, 687 A.2d 238 (Me.1996) illustrate, discretionary function immunity may not be invoked "where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally." *Rodriguez*, 2007 ME 68, ¶ 22, 922 A.2d at 490 (quotation marks omitted). Taken to its logical conclusion, the concurring opinion's broad interpretation of discretionary function immunity would insulate virtually every governmental entity from any kind of tort suit because all operational, policy, and scheduling decisions would be treated as uniquely governmental and therefore subject to immunity under the Maine Tort Claims Act.

[¶ 71] Here, one MDOT employee was wholly in charge of implementing all striping activities. This striping was a routine operational function that did not implicate any policy evaluation or judgment on his part. He did not hold a degree in engineering and did not decide whether Route 302 needed to be striped. He was not making decisions for the MDOT on its overall schedule of operations or its prioritization of projects, and he was not juggling the Route 302 repaving with other projects. *See, e.g., Carroll v. City of Portland*, 1999 ME 131, ¶¶ 2–3, 9, 736 A.2d 279, 281, 283 (denying discretionary function

immunity to police officer who mistakenly identified plaintiff as a wanted person to the local television station and clarifying that "ministerial" as opposed to discretionary acts, are "those to be carried out by employees, by the order of others or of the law, with little personal discretion as to the circumstances in which the act is done"). This is simply not the type of policy-related activity that discretionary function immunity was designed to protect. A function cannot be defined as discretionary merely because it involves some aspect of choice. If that were the case, almost any activity, no matter how routine or lacking in policy-related content, would be shielded by immunity. The concurring opinion also implies that tight budget concerns and constraints on resources would permit a less stringent application of the MTCA. I find that argument to be far-reaching and implausible because this is clearly not the case here.

[¶ 72] In essence, under the concurring opinion's definition, any kind of choice made by a governmental entity would invoke protection under the MTCA, therefore rendering such tort claims meaningless and leaving the public with no recourse against unchecked, unsafe, and negligent government tortfeasors. I therefore agree with the majority and read discretionary function immunity much more narrowly, to distinguish ministerial acts as decisions carried out on a day-to-day operational level from actions entitled to discretionary function immunity because they "serve[ ] the basic governmental objective of public safety," *Norton v. Hall*, 2003 ME 118, ¶¶ 7–9, 834 A.2d 928, 931, and are "essential," *Doucette v. City of Lewiston*, 1997 ME 157, ¶ 6, 697 A.2d 1292, 1294. I agree that road striping and paving in this context was ministerial and MDOT should not be entitled to the protection of discretionary function

immunity under the Maine Tort Claims Act.