STATE OF MAINE                              SUPERIOR COURT
CUMBERLAND, ss.                             CIVIL ACTIONS
                                            Docket Nos. CV-06-444,
                                            CV-06-445, CV-06-446,
                                            CV-06-447, CV-06-448,
                                            CV-06-449, CV-06-450,
                                            CV-06-451, CV-06-452,
                                            CV-06-453, CV-06-454,
                                            CV-06-469, CV-07-91

AMANDA SUE WILCOX, et al.,

      Plaintiffs,

    v.                                  ORDER

CITY OF PORTLAND,

      Defendant/Third-Party Plaintiff,

    v.

SCOTIA PRINCE CRUISES LTD,

      Third-Party Defendant.

Before the court in these consolidated cases is the City of Portland's motion for summary judgment based on the various immunities contained in the Maine Tort Claims Act.

Plaintiffs are thirteen individuals who worked at Portland's former International Marine Terminal and allege that as a result of the City's negligence in maintaining and repairing the terminal, they were exposed to airborne biotoxins emanating from mold in the terminal and have developed various resulting illnesses.

Each of the thirteen plaintiffs have filed individual lawsuits against the City, and those lawsuits have been consolidated for purposes of considering the City's immunities under the Maine Tort Claims Act and for purposes of liability. See Order of December 6, 2006. The parties have also agreed to conduct this litigation in stages with

the first stage focusing on the immunity defenses raised by the City.[1] In three of the cases – the cases brought by plaintiffs Barry Bartlett, Sadie Thomas-Frye, and Hayley Saunders, who were not employees of Scotia Prince Cruises Ltd. – the City has filed third-party complaints against Scotia Prince Cruises, but the third-party claims are not directly at issue on the instant motion.

1.    Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Johnson v. McNeil*, 2002 ME 99 ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. *Id*. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

In this case, because so many potential immunity issues and so many plaintiffs are involved, the parties' respective statements of material facts total 346 paragraphs. The court will not recite or attempt to summarize those facts except to the extent that they are crucial to a ruling on the motion.

---

[1] The parties have deferred one immunity issue – whether the City has waived immunity (at least to some extent) because it is named as an additional insured on certain insurance policies obtained by third-party defendant Scotia Prince Cruises Ltd. *See* 14 M.R.S. § 8116.

2

As will be discussed below, the immunity defenses raised by the City in this case not only raise a number of unsettled issues under the Maine Tort Claims Act but also raise difficult and unsettled issues with respect to general tort law. These include (1) under what circumstances a "discovery rule" should be applied in connection with the statute of limitations, (2) whether the "continuing tort" doctrine should be applied in this case, and (3) the applicability of a statutory damage cap in cases involving multiple plaintiffs who are all potentially subject to the same cap.

2.      Public Building

Under 14 M.R.S. § 8103(1) the City, as a governmental entity, is immune from suit on any tort claims seeking recovery of damages except as expressly provided by statute. Plaintiffs contend that their claims are permitted by 14 M.R.S. § 8104-A(2), which provides, with several exceptions not pertinent to this case, that a governmental entity is liable for "its negligent acts or omissions in the construction, operation or maintenance of any public building." Plaintiffs contend that this case arises from the City's negligence in the operation or maintenance of a public building. The City contends that despite its ownership of the terminal, the terminal does not fall within the definition of a "public building" under § 8104-A(2).

The Law Court has most recently and most comprehensively considered the issue of what constitutes a "public building" in *Rodriguez v. Town of Moose River*, 2007 ME 68 ¶¶ 30-33, 35, 922 A.2d 484, 492-94. Under that case, the relevant criteria to be considered include whether a building is accessible to the public, is owned by the government, serves a public purpose, provides services to the people on a business

3

basis, and is under some degree of governmental control. *Id.* ¶¶ 32-33, 35, 922 A.2d at 493 citing, *inter alia*, to *Black's Law Dictionary* and *Webster's Third New International.*[2]

Based on these criteria, the court concludes that plaintiffs have at least raised disputed issues of fact as to whether the terminal was a "public building." The terminal consisted of two buildings, both owned by the City and both accessible to the public – specifically, members of the public traveling on the Nova Scotia ferry or meeting passengers on that ferry.[3] Portions of the East Building were leased to Scotia Prince Cruises on a "non-exclusive" basis with portions designated as a "shared use" area between Scotia Prince Cruises and the City. *E.g.*, Schrader Ex. 3. Moreover, the portion of the East Building that was used by U.S. Customs was owned by the City and was not leased on either an exclusive or non-exclusive basis.

There is also evidence that maintaining some kind of an International Marine Terminal served a public purpose in promoting and facilitating Portland's role as a port.[4] In addition, plaintiffs have offered evidence that, even with respect to the portions of the terminal that were subject to the exclusive use of Scotia Prince Cruises, the repair and maintenance of the entire terminal remained under a considerable degree of City control.

---

[2] It is not necessarily required that all of these criteria be met. In *Rodriguez* a building was found to constitute a "public building" within the meaning of 14 M.R.S. § 8104-A(2) even though it was privately owned and had not been leased to any governmental entity. Moreover, jails and prisons have generally been found to be "public buildings" even though they are not accessible to the general public.

[3] The West Building was less accessible to the public, but that was where the ticket office was located.

[4] The proposition that maintaining Portland's role as a port is a public purpose is demonstrated by the fact that since 1999, the City has been engaged in a project to develop a new, more modern terminal (Ocean Gateway). The City thus obviously perceives that the existence of such a terminal serves a public purpose. This is not a case where the City owned a building that it had no current use for and had therefore leased it to a private entity for whatever uses the private entity might choose to undertake.

On this record, the City is not entitled to summary judgment on the basis that the terminal was not a "public building."

3.    Lease Exception

Section 8104-B of the Tort Claims Act provides that, notwithstanding the waiver of immunity for negligence in the operation or maintenance of a public building, a governmental entity is not liable for any claim which "results from . . . the leasing of governmental property, including buildings." 14 M.R.S. § 8104-B(6). It is undisputed, moreover, that at least part of the terminal was leased to Scotia Prince Cruises, and that 10 of the 13 plaintiffs were employed by Scotia Prince Cruises. Two other plaintiffs, although apparently employed by the Nova Scotia Tourist Office, also worked in areas that had been leased to Scotia Prince Cruises.[5]

There is no Law Court precedent on the breadth or meaning of the "lease" exclusion. At the outset, the court interprets § 8104-B(6) as a measure designed to shield the City from liability on tort claims arising in connection with leased property. This is true for several reasons. First, although plaintiffs appear to argue that § 8104-B(6) only excludes tort claims that directly arise out of the lease process itself, it is difficult to imagine what purpose would be served by the lease exception if this were true. The court is unable to think of any tort claims that would directly arise out of the lease process. Second, any doubt as to whether § 8104-B(6) should be interpreted to shield the City from tort claims by persons who are present on government-owned property that has been leased to non-governmental agencies is resolved by the principle that

---

[5] Only plaintiff Bartlett appears to have worked in an area of the terminal that was not subject to a lease on either a non-exclusive or exclusive basis.

5

exceptions to sovereign immunity are to be narrowly construed. *New Orleans Tanker Corp. v. Department of Transportation*, 1999 ME 67 ¶ 5, 728 A.2d 673, 675.

A more difficult question involves whether a governmental entity should have immunity from claims arising from the operation or maintenance of a public building that has been leased under circumstances where the governmental entity has retained control over maintenance and repairs of the building in question. An even more difficult question is presented when – at least as to part of the public building in question – the lease is for non-exclusive use and the governmental entity is also, under the terms of the lease, using a portion of the leased premises on a "shared use" basis.

The lease provision was originally enacted in 1986 as part of legislation authorizing state agencies to lease unused space to not-for-profit organizations. Laws 1985, c. 758. The legislation in question contained two provisions addressed to liability. The first, contained in the provisions authorizing the leasing of state property and now codified in 5 M.R.S. § 1786, provided as follows:

> Whenever a lease is offered to or signed by another organization pursuant to this chapter, the lease conditions shall clearly state that the State or any State agency shall not be liable for any personal injury or death or any property damage sustained as a result of the lease of the available facility in accordance with this chapter. The State shall not be liable for any actions of the lessee or the employees of the lessee.

The second provision was an amendment to the Tort Claims Act providing that notwithstanding the statutory provision waiving immunity in certain instances,[6] a governmental entity shall not be liable for any claim which results from "leasing of state-owned property." Laws 1984, c. 758 § 2.

---

[6] At that time waivers of immunity were contained in 14 M.R.S. § 8103. In the 1987 amendments to the Tort Claims Act, the provisions waiving immunity were recodified in § 8104-A.

The relevant statement of fact, L.D. 2291, 112th Legis., 2d Sess. 9 (1986), recites that the State is not liable for any death, personal injury, or property damage "resulting from the lease of available State facilities to not for profit organizations." As is apparent from the language recited above, however, the Tort Claims Act amendment language covered leasing of state-owned property in general, not just leasing to not-for-profits.

Subsequently in Laws 1987, c. 740 § 4, the Tort Claims Act exclusion was broadened to cover leasing of governmental property in general, not just State-owned property. The provision was added in by committee amendment. *See* Committee Amendment "A" to L.D. 2443, 113th Legis. 2d Sess. (1988). The Committee file contains a document prepared by the Maine Municipal Association which contains the proposed change that was eventually enacted to § 8104-B(6) and which recites that the proposed amendment in question "is designed to extend to other governmental entities the immunity now enjoyed by the State in relation to the leasing of property, including buildings."

The legislative history thus does not shed light on whether the immunity for claims resulting from the leasing of property was intended to apply even when, as in this case, there is evidence that the City retained control over maintenance and repair of the leased premises except with respect to repairs costing less than $100. *See, e.g.*, City's Statement of Material Facts ¶ 32. It also offers no assistance as to whether the provision applies when the lease by its terms covers the "non-exclusive" use of certain specified portions of the premises. *See, e.g.*, Schrader Exs. 2, 3 (reference to "exclusive use" and "shared use" areas); 1986 Lease §§ 3.1, 3.2 (Exhibit B to Plaintiffs' SMF).

Since a landlord generally cannot be held liable for conditions on premises unless it has retained control over the areas where the conditions in question exist, *see, e.g.*, *Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984), the lease exclusion would not appear to

serve any purpose if it did not apply in cases where the governmental lessor retained control. Even if the court were to conclude, however, that the broad language of the leasing provision, interpreted in light of the principle that exceptions to sovereign immunity are to be narrowly construed, immunizes the City from all claims arising within the leased area, exclusive or not, the City is not entitled to summary judgment on this record. As noted above, at least one plaintiff worked in the Customs area which was not the subject of any lease. Moreover, given the non-exclusive use provisions and the fact that the Customs portion of the East Building was not leased, the lease is at best ambiguous as to whether areas such as the walls of the passenger terminals and the restrooms – among the areas where mold was found, *see* Plaintiffs' Statement of Additional Material Facts ¶ 40 – were covered by the lease. However broadly it might otherwise be interpreted, § 8104-B(6) does not immunize the City from claims arising from portions of a public building that were not the subject of a lease.

Moreover, plaintiffs have offered evidence that based on the presence of mold, they were exposed to airborne biotoxins which migrated throughout the terminal and originated from all parts of the terminal, not just from specific places within the terminal. *See* Plaintiffs' Statement of Additional Material Facts ¶¶ 44-47. Based on the summary judgment record, therefore, the court cannot grant summary judgment against those plaintiffs who only worked within leased areas since it cannot be ruled out at this stage that they were exposed to biotoxins from areas that were not leased.[7]

---

[7] In addition, the summary judgment record also indicates that many plaintiffs worked in more than one area of the terminal.

4.   Discretionary Function

The City contends that it is alternatively entitled to immunity under another provision of § 8104-B, which provides that notwithstanding Section 8104-A, a governmental entity is not liable for any claim which results from "[p]erforming or failing to perform a discretionary function or duty." 14 M.R.S. § 8104-B(3).

Specifically, the City contends that it made a discretionary policy decision as to how to allocate scarce resources available for port facilities between the existing and antiquated International Marine Terminal and the new Ocean Gateway Project, and its alleged failure to maintain and repair the terminal and prevent the mold problem should therefore be immunized under the discretionary function provision.

The Law Court has frequently referred to a four part test, first announced in *Darling v. AMHI*, 535 A.2d 421, 426 (Me. 1987), to determine whether discretionary function immunity applies:

1. Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective?

2. Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

3. Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

4. Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Accord, Rodriguez*, 2007 ME 68 ¶ 22, 922 A.2d at 490; *Norton v. Hall*, 2003 ME 118 ¶ 7, 834 A.2d 928, 931; *Roberts v. State*, 1999 ME 89 ¶ 8, 731 A.2d 855, 857; *Adriance v. Town of Standish*, 687 A.2d 238, 240 (Me. 1996).

9

It is not always easy to determine how this test will be applied in any given case. For instance, it is difficult at first glance to see how the action complained of in *Roberts v. State*, 1999 ME 89 ¶ 2, 731 A.2d at 856, constituted a policy decision or an action essential to the realization of a governmental program. The Law Court has also looked beyond the four factor test to consider such factors as whether the action in question was "uniquely governmental" in nature, *Tolliver v. MDOT*, 2008 ME 83 ¶ 17, 948 A.2d 1223, 1229; whether it resembles activities performed by non-governmental actors, *Adriance*, 687 A.2d at 241; and whether or not the action is "operational" in nature. *Rodriguez*, 2007 ME 68 ¶¶ 22-23, 922 A.2d at 490.

In the court's view one useful method of analysis is to consider whether, as a matter of public policy, the action for which discretionary immunity is sought involves decisions that governmental officials should be allowed to make without considering the possibility of liability. In other words, if the threat of liability could influence a decision maker to avoid taking action that might be in the public interest, then immunity should be available. On the other hand, where the threat of liability would influence decision makers to take safety precautions with no detriment to the public interest, immunity should be less readily available.

Considering the various tests that have been proposed, the court concludes that the alleged actions complained of in this case – negligently failing to take remedial action with respect to a hazardous condition of which the City knew or should have known – are not entitled to discretionary immunity. The actions in question are operational in nature. The City's actions as a landlord are not "uniquely governmental" but resemble as those of a private landlord. Nor can the court discern any reason why permitting the claims to go forward could negatively influence governmental decisions that should be made in the public interest. For purposes of discretionary function

10

immunity, it is in the public interest if the threat of liability provides an incentive for a municipality to take action to prevent the creation of health hazards in a city-owned building. As the Law Court noted in *Rodriguez*, if discretionary immunity were available in such situations governmental entities "could be immune from suit for allowing the persistence of hazardous conditions on property that they are required to maintain." 2007 ME 68 ¶ 23, 922 A.2d at 490-91.

Finally, the City's argument that the problem here resulted from a discretionary decision as to the allocation of resources does not convince the court that summary judgment should be granted on discretionary function immunity. While that argument may have validity where more uniquely governmental functions are involved,[8] the Law Court recently rejected such a rationale in *Tolliver v. MDOT*, 2008 ME 83 ¶¶ 23-25, 948 A.2d at 1231-32, noting that once the discretionary decision to undertake road repairs is made, the operational decisions made in performing those repairs are not entitled to immunity.

This case may involve higher-level decision-making than *Tolliver*, but at least on this record there are factual issues for trial as to whether any allegedly negligent failure to recognize and prevent the mold problem resulted from discretionary policy decisions or operational decisions.[9]

5.     Timeliness

Under the Tort Claims Act, unless good cause is shown, a notice of claim must be filed with the governmental entity within 180 days after the cause of action accrues. 14

---

[8] *See Chiu v. City of Portland*, 2002 ME 8 ¶¶ 19-24, 788 A.2d 183, 189-90 (allocation decisions with respect to enforcement of housing code).
[9] In this context, the court notes that the City has not offered evidence that it was aware of the mold problem and the potential health hazard but made a policy decision (1) not to remedy or prevent the problem and also (2) not to shut down the terminal.

11

M.R.S. § 8107(1). In addition, a lawsuit must in any event be commenced within 2 years after the cause of action accrues. 14 M.R.S. § 8110.[10] In this case notices of claim were filed on February 7, 2005 for all plaintiffs except Barry Bartlett (notice filed May 20, 2005) and Hayley Saunders (notice filed May 23, 2005). Moreover, with two exceptions, all these actions were commenced on August 14, 2006. The two exceptions are George Wardwell (complaint filed August 21, 2006) and Hayley Saunders (complaint filed February 20, 2007).

With the exception of Barry Bartlett, if the claims of the parties were timely under the two-year statute of limitations in § 8110 they will necessarily also be timely under the 180-day notice of claim provision. Thus, the claims of the ten plaintiffs other than Bartlett who filed their complaints on August 14, 2006 will be timely so long as their causes of action accrued on or after August 14, 2004. The three remaining plaintiffs are Barry Bartlett, George Wardwell, and Hayley Saunders. Bartlett filed his complaint on August 14, 2006 but because he did not file his notice of claim until May 20, 2005, his cause of action had to have accrued on or after November 21, 2004 (unless there was good cause for a delay in the filing of his notice of claim). George Wardwell filed his complaint on August 21, 2006, so his claims will be time barred unless they accrued on or after August 21, 2004. Finally, Hayley Saunders filed her complaint on February 20, 2007, and her claim will be time barred unless her cause of action accrued on or after February 20, 2005.

There are three potentially relevant time periods to be considered with respect to when the causes of action accrued. The first is when a plaintiff experienced health problems which he or she now attributes to mold, even if he or she was not aware of the presence of mold at the time or did not initially attribute the health problems in

---

[10] There is no good cause exception to the two-year deadline in § 8110.

question to mold. The City argues that a cause of action usually accrues at the point when a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial relief. *See Dugan v. Martel*, 588 A.2d 744, 746 (Me. 1991). If this theory were adopted, it appears that all of the claims in question would be time barred.[11]

The second potentially relevant period of time would be the period when the plaintiffs were allegedly exposed to biotoxins in the terminal. It is undisputed that, with the exception of Barry Bartlett, all of the plaintiffs left the terminal on or before August 22, 2004 and never returned to the terminal to work. City SMF dated December 28, 2007 ¶ 62.[12] Specifically, eight of the plaintiffs left the building on or about August 22, 2004. Seven of those plaintiffs filed their complaints on August 14, 2006 and one (George Wardwell) filed his complaint on August 21, 2006. All of these plaintiffs, therefore, were allegedly exposed to biotoxins within the two-year statute of limitations – either for eight days (from August 14-22, 2004) or, in the case of Wardwell, for two days (August 21-22, 2004).

If exposure to biotoxins is determinative for statute of limitations purposes and if continued exposure to biotoxins (even for a very short period) allegedly caused harm to these plaintiffs during the statue of limitations period, their complaints are not subject to dismissal at this time.[13] The same would be true for plaintiff Bartlett, who did not

---

[11] *See* City SMF dated December 28, 2007 ¶¶ 119, 126, 132-33, 141-42, 152-53, 163-64, 171-72, 180-81, 188-89, 194, 203-04, 217-18, 224-25 (admitted).

[12] There is evidence that one or two plaintiffs who had left the building on August 22, 2004 returned to the terminal on one occasion later in 2004 for a repeat exposure test. *See* Plaintiffs' Response to ¶ 62 of City's SMF.

[13] This is true regardless of whether the court adopts a "continuing tort" theory. Under such a theory, a defendant would be potentially liable for the entire amount of harm inflicted if the tort continued during the statute of limitations period. The court does not have to adopt that theory, however, in order to find a complaint timely as to any harm (even if only partial) inflicted during the statute of limitations period. The Law Court has stopped short of adopting a continuing tort theory in similar contexts but has left open the possibility that such a theory would be available. *See McLaughlin v. Superintending School Committee of Lincolnville*, 2003 ME 114 ¶ 23 n.6, 832 A.2d 782, 789 n.6.

leave the terminal until August 2005, who filed his complaint in August 2006, and whose period of exposure during the statute of limitations period lasted approximately a year.

At least four plaintiffs, however, were not exposed to biotoxins at the terminal during the two years prior to the filing of their complaints – Mark Hudson, who left the terminal in December 2003; Jay Frye, who ceased working at the terminal in May 2003; Sadie Thomas-Frye, who ceased working at the terminal in December 2003; and Hayley Saunders, who ceased working at the terminal in October 2000.

The final time period that is potentially relevant for statute of limitations purposes would be the date that the plaintiffs discovered that they had been exposed to biotoxins. Under such a discovery rule (urged by plaintiffs), all of their complaints would potentially be timely since they all allege that they first learned they had been exposed to biotoxins within two years of the filing of their complaints. If this theory were adopted, there are at least disputed issues of fact on this point.[14]

---

[14] If a discovery rule were to be applied, the cause of action would not have accrued until a plaintiff discovered (or in the exercise of reasonable care should have discovered) that he or she was suffering from illnesses related to the mold problem in the building. *See Bernier v. Raymark Industries Inc.*, 516 A.2d 534, 543 (Me. 1986). In this case there are some plaintiffs who were aware that there was mold in the building, but as to those plaintiffs there is a dispute as to whether, in the exercise of reasonable care, they should have recognized that their illnesses were mold-related. The most problematic plaintiff in this category is Robert Schrader. According to the summary judgment record, Schrader began experiencing health problems as soon as he started working in the terminal in 2002 and wrote a letter complaining of "the extensive existence of mold and mold spores throughout the facility" in February 2003. In that letter he also wrote that

> mold litigation is on the rise and is viewed by some as the next ADA-type boon for plaintiff's attorneys. Throughout the country, municipalities and other governmental agencies have had to undertake expensive mold abatement processes that are far more extensive than asbestos abatement programs.

Schedule Dep. Ex. 11, page 4. Schrader argues that this only shows he recognized mold as a litigation risk rather than a health risk. *See* Plaintiffs' Response to City SMF ¶ 209. While this contention may be far-fetched, there is still an issue of fact as to whether, even if it is obvious

14

Whether to adopt a discovery rule in this case depends on how the court interprets the Law Court's decision in *McLaughlin v. Superintending School Committee of Lincolnville*, 2003 ME 114, 832 A.2d 782. *McLaughlin* concerned a claim brought against a school district for health problems allegedly caused by poor air quality in the Lincolnville Central School. In order to prevail against the statute of limitations defense raised by the school district, the plaintiff had to show that there were disputed issues of fact as to whether the plaintiff's cause of action accrued on or after September 21, 1999. The plaintiff had remained in the school until April 14, 2000, *see* 2003 ME 114 ¶ 6, 832 A.2d at 784, and had therefore been exposed to the allegedly unhealthy condition within the statute of limitations period. The Law Court, expressly noting that "we need not consider the application of a discovery rule exception here," ruled that the school had not established that the plaintiff's injuries were not the result of his post September 21, 1999 exposure to the school's air. 2003 ME 114 ¶ 23, 832 A.2d at 789.

Despite the fact that it had previously expressly declined to consider the application of a discovery rule, the court then proceeded to discuss *in dicta* that the school district had also not established that the plaintiff's guardian had reason to understand the causal relationship between the plaintiff's health condition and the school air quality. *Id.* ¶ 24. Plaintiffs argue that this establishes that a discovery rule was applied *sub silentio* in *McLaughlin* and should also be applied in this case.

The court declines to apply a discovery rule in this case. First, *McLaughlin* is too slim a reed for the application of a discovery rule given its express statement that it was declining to consider such a rule and given that it had already concluded that the

---

that mold was a litigation risk because it was a health risk, Schrader should have recognized that his own health issues could have resulted from mold.

plaintiff's exposure during the statute of limitations period was sufficient to defeat summary judgment.[15]

Second, in an area where the Law Court has previously been clear that the discovery rule has only been approved in extremely limited situations, trial courts should defer to the Law Court with respect to any expansion of that rule. Previously the Law Court had expressly declared that a discovery applies in only three situations: legal malpractice, foreign object and negligent diagnosis medical malpractice, and asbestosis. *Johnston v. Dow and Coulombe Inc.*, 686 A.2d 1064, 1066 (Me. 1996). In several of those instances, moreover, the Legislature has subsequently limited the reach of the discovery rule. *See* 14 M.R.S. § 753-A; *Johanson v. Dunnington*, 2001 ME 169 ¶¶ 8-9, 785 A.2d 1244, 1246-47; 24 M.R.S. § 2902; *Dasha v. Maine Medical Center*, 665 A.2d 993, 996 (Me. 1995). Moreover, even though the court in *Johnston v. Dow and Coulombe Inc.* listed asbestosis as an instance where a discovery rule was applied, the Law Court's decision in *Bernier v. Raymark Industries* actually stops short of adopting such a rule. *See* 516 A.2d at 543.

Perhaps more importantly, in every instance where a discovery rule has been adopted, one of two circumstances existed: either (1) the plaintiff had an injury which had not manifested itself, *e.g.*, *Bernier*, 516 A.2d at 542-43 ("sub clinical injury"); *Bolton v. Caine*, 541 A.2d 924, 926 (Me. 1988) ("latent medical condition"), or (2) the plaintiff and the alleged tortfeasor had a fiduciary relationship or another similar relationship (such as a doctor-patient relationship) in which the plaintiff had reposed trust and confidence

---

[15] Moreover, *McLaughlin's* further discussion in *dicta* of whether the plaintiff's guardian had reason to know of the causal relationship between plaintiff's illness and air quality purports to rely on *Townsend v. Chute Chemical Co.*, 1997 ME 46 ¶ 9, 691 A.2d 199, 202. However, the relevant portion of *Townsend* was not directed to whether the claimant in that case had reason to know of any causal relationship. Rather, it involved a question of whether the claimant had previously experienced a rash from the same cause – regardless of whether there was any <u>awareness</u> of the causal connection.

in the alleged tortfeasor and therefore would not readily suspect that a breach of duty had occurred. *See Dunelawn Owners Assoc. v. Gendreau*, 2000 ME 94 ¶ 14, 750 A.2d 591, 596 (discovery rule inappropriate in the absence of a fiduciary relationship).

In this case the medical problems experienced by the plaintiffs were not sub-clinical or latent, nor can it conceivably be argued that their relationship to the City of Portland was a fiduciary relationship or a relationship of trust and confidence. Summary judgment should therefore be granted with respect to the claims brought by Jay Frye, Sadie Thomas-Frye, Mark Hudson, and Hayley Saunders.

As to whether the statute should run from the onset of plaintiffs' health problems or from plaintiffs' last exposure, the court concludes that on this issue it should follow *McLaughlin's* holding and look to period of last exposure. *See* 2003 ME 114 ¶¶ 21, 23. As noted above, even if the continuing tort theory were not applicable, the City has not on this record eliminated the possibility that plaintiffs incurred some medical harm during the two years prior to August 14, 2006.[16] Summary judgment is therefore denied with respect to the timeliness of the claims brought by plaintiffs Bartlett, Crawford, Delano, Hamill, Libby, Salisbury, Schrader, Wardwell, and Wilcox.

---

[16] As a practical matter, the court recognizes that (with the exception of Bartlett) it may be improbable that plaintiffs suffered much appreciable harm during the brief period in which they remained in the terminal during the two years prior to the filing of their complaints. As noted above, many plaintiffs remained in the terminal for only eight days at the beginning of that time period and one plaintiff (Wardwell) was only in the terminal for two days during that period. The court is inclined, however, to conclude that this is an appropriate case to apply the continuing tort doctrine – where the harm is caused by the cumulative effect of the mold conditions for which the City allegedly bears responsibility, where no single incident can realistically be identified as the cause of significant harm, and where the result is a continuing wrong that terminates when the exposure to the harm terminates. *See McLaughlin*, 2003 ME 114 ¶ 23 n.6, 832 A.2d at 789 n.6.

6.    Damage Cap Per Single Occurrence

The final issue raised by the City's motion for summary judgment is whether the $400,000 cap on damages for any one occurrence applies in this case. Specifically, 14 M.R.S. § 8105(1) provides as follows:

> In any claim or cause of action permitted by this chapter, the award of damages, including costs, against either a governmental entity or its employees, or both, may not exceed $400,000 for any and all claims arising out of a single occurrence.

To the court's knowledge, the Law Court has not yet provided guidance as to the interpretation of "single occurrence" for purposes of § 8105(1). In a case of this nature, moreover, the issue of what constitutes a single occurrence presents significant difficulties.

The City argues that the occurrence here is its alleged failure to recognize and remedy the buildup of a mold condition in the terminal that resulted in plaintiffs' exposure to airborne biotoxins. If so, the City argues, there was one occurrence and the nine remaining plaintiffs would potentially face an aggregate damage cap of $400,000. The plaintiffs understandably disagree, arguing that the summary judgment record raises factual disputes as to whether there were numerous distinct negligent acts or omissions by the City in connection with the maintenance and repair of the terminal.[17] Both sides cite to federal cases and other jurisdictions that have considered the interpretation of "per occurrence" language in insurance contracts or in other governmental tort claims acts. *See, e.g., Honeycomb Systems Inc. v. Admiral Insurance Co.,*

---

[17] Neither side argues that the number of occurrences should be measured by the number of injuries – *i.e.*, that each plaintiff's injury is a separate occurrence subject to a separate $400,000 cap. It is the court's recollection that at oral argument, the parties agreed that such a contention would appear to be foreclosed by the wording of § 8105(1), which applies the $400,000 cap to "any and all claims" arising from a single occurrence.

567 F. Supp. 1400, 1405-06 (D. Me. 1983);[18] *Home Indemnity Co. v. City of Mobile,* 749 F.2d

659, 663 (11th Cir. 1984); *Folz v. State of New Mexico,* 797 P.2d 246, 254 (N.M. 1990).[19]

For purposes of summary judgment, the court accepts that there were multiple

water intrusions at various locations in the terminal which allegedly resulted in "toxic

mold spores, toxic secondary byproducts of mold, mycotoxins, toxic bacteria, and

endotoxins present throughout the [terminal], from one end of the building to the

other." Plaintiffs' Opposition to Defendant's Summary Judgment Motion, dated

February 15, 2008, at 34. The question is whether each separate water intrusion and

each alleged failure on the part of the City to properly and promptly respond to each

separate water intrusion potentially constitute a separate occurrence.

Although plaintiffs argue that the answer to this question is yes, there are several

problems with their argument. First, the City's alleged liability is based on whether, as

a landlord acting in the exercise of reasonable care, it knew or should have discovered

and remedied the existence of a condition on the premises that endangered the

plaintiffs. *See* Restatement 2d Torts §§ 342, 343. The alleged condition in question is the

overall hazard caused by toxic mold. This is a single problem, not a set of distinct

occurrences. Plaintiffs are not alleging that they suffered distinct injuries as a result of

separate instances of water intrusion.

---

[18] The *Honeycomb Systems* case sought to apply Maine law but did not find any specific authority on point so instead applied general principles and looked to the law of other jurisdictions. 567 F.Supp. at 1404 n.2.

[19] At least one of the cases cited by plaintiffs, however, is based in part on the principle that ambiguous language in an insurance contract should be construed in favor of coverage. *See Norfolk & Western Ry. Co. v. Accident & Casualty Insurance Co.,* 796 F.Supp. 929, 936 (W.D. Va. 1992). Statutory language rather than policy language is involved here, and there is no principle that ambiguities in the Tort Claims Act should be resolved against the governmental entity. To the contrary, *see New Orleans Tanker Corp. v. Department of Transportation,* 1999 ME 67 ¶ 5, 728 A.2d at 675.

Second, it is illogical for the extent of the City's liability to turn on the number of separate instances of water intrusion rather than the overall mold problem. There is no good reason why there should be a dramatic difference in the amount that these plaintiffs could potentially recover depending on whether the mold problem in the terminal resulted from a series of separate water intrusions at various different locations or whether it resulted from a single major water intrusion.

In the court's view, the argument that each water intrusion constituted a separate occurrence cannot be squared with the intent of § 8105(1). By way of analogy, one may consider a situation where a group of plaintiffs had been passengers on a bus who were all injured when the bus collided with a City vehicle and there was evidence that the City driver had been exceeding the speed limit and that his brakes had failed. Although an argument could made that there were two separate occurrences – (1) excessive speed and (2) brake failure – the court has very little doubt that only one occurrence would be found.

The court therefore is inclined to adopt the interpretation of "single occurrence" propounded by the Supreme Court of New Mexico in the *Folz* case:

> [A]ll injuries proximately caused by the governmental agency's successive negligent acts or omissions that combined concurrently to create a singular, separate, and unitary risk of harm . . .

797 P.2d 246, 254. However, the court will not enter a summary judgment finding that this case involves a single occurrence within the meaning of § 8105(1). This is true for two reasons. First, the court cannot conclude that the summary judgment record forecloses the possibility that plaintiffs' claims arose out of more than one occurrence. The terminal consisted of two buildings, the exposures occurred over a number of years, and the record is devoid of evidence as to how many opportunities the City allegedly had to recognize the problem and take remedial action.

20

Thus, the court does not necessarily disagree with the decision of the Eleventh Circuit in a case cited by plaintiffs, *Home Indemnity Co. v. City of Mobile*, 749 F.2d at 663. That case involved flood damage allegedly resulting from the City of Mobile's negligence in the planning, construction, operation and maintenance of its drainage system. The court concluded that "each discrete act or omission, or series of acts or omissions, on the part of the City of Mobile which caused water to flood and damage properties" was a single occurrence for purposes of a per occurrence clause in the City's insurance policy. *Id.* (emphasis added). The court went on to say:

> Thus, if on account of the City's negligence, a drain on one street was blocked so that water flooded the houses on that street, that would be one "occurrence" with a limit of $100,000 applicable to the total damage done to the houses. If, at some other location, on account of negligence on the part of the City, a storm sewer spilled over or broke open so that water flooded one house, that would be another occurrence with a total of $100,000 coverage available for the claims arising out of the damage to that house. If on the other side of the City, on account of the City's negligence, water flooding caused damage to 100 houses, that would be a third "occurrence" and there would be $100,000 in coverage applicable to all property damage proximately resulting from that negligent act.

*Id.*

In *City of Mobile*, the Eleventh Circuit did not expressly consider whether, if two storm drains failed on the same street resulting in one flooded area, that would constitute two "occurrences." However, plaintiffs are not contending here that they were separately harmed by different acts of negligence with respect to separate locations in the terminal. Instead, they are arguing, as noted above, that all of the plaintiffs were exposed to biotoxins from all parts of the terminal, rather than from isolated parts of the terminal. *See* Plaintiffs' SMF dated February 15, 2008, Additional

Facts ¶ 47.[20] Nevertheless, the City has not established on this record that there was only one series of alleged acts or omissions that injured all of the plaintiffs.

An additional reason to withhold summary judgment in this case is that the court has become aware that there are decisions holding, with respect to per occurrence clauses in insurance contracts, that separate toxic exposures can constitute separate "occurrences." *See, e.g., Metropolitan Life Insurance Co. v. Aetna Casualty & Surety Co.*, 765 A.2d 891, 905 (Conn. 2001). The court reserves decision on whether the reasoning in those cases could apply outside of the insurance context, on whether those decisions are correctly decided, and on whether they can be reconciled with the language and intent of the Maine Tort Claims Act. However, the parties have not had the opportunity to brief those issues.

If it is ultimately found that a single occurrence was involved here, the court would derive no satisfaction from such a result. Damage caps have been found to survive rational basis scrutiny, but it cannot be denied that they have arbitrary and often unfair results. That is particularly true when they are applied on a per occurrence basis to a group of claimants.[21] In large part, however, this is because § 8105(1) is not intended to result in fairness to claimants but is instead designed to protect public treasuries.

---

[20] In addition, in contrast to *City of Mobile*, the liability of the City in the case at bar does not depend on whether the City was negligent with respect to repairs and maintenance. Rather it depends on whether the City was negligent in failing to recognize and remedy the mold problem.

[21] Such a cap also raises awkward procedural issues. For instance, it would appear to require that all of the claims arising out of a single occurrence (or group of related occurrences) be tried to verdict before any of the judgments can become final. This is necessary in order to determine whether the overall damages exceed $400,000 times the number of occurrences. If they do, it will be necessary to proportionately reduce each verdict in order to stay within the cap. The court agrees with the reasoning in *Drummond v. City of Portland*, Docket CV-83-18 (Superior Ct. Cumberland County) 1985 Me. Super. LEXIS 28, *6- *7 (Wernick, J.) that the per occurrence cap in § 8105(1) must be interpreted to apply regardless of how many lawsuits are brought or whether those cases are consolidated, but the practical problems created thereby are formidable.

22

In this context, it is instructive to consider the report of the Judiciary Committee on Sovereign Immunity at the time the Tort Claims Act was first enacted in 1977. That report observed that the Tort Claims Act adopted a closed end approach to the liability of state and local governments, as opposed to the open-ended approach of the Federal Tort Claims Act. While the Committee report recognized that an open ended approach meant that persons who were actually injured and deserving of compensation were less likely to be barred from recovery, the Committee concluded that the open ended approach would subject governmental entities to increased costs and raised serious questions of insurability. Report at 2-3. It therefore adopted the closed end approach and the damage cap contained in § 8105(1). While that leads to a potentially arbitrary and unfair result in this case, assuming that only a single occurrence is found and that plaintiffs as a group would otherwise recover more than $400,000, this court is not empowered to rewrite the statute to achieve fairer results. In the court's view, redress for any unfairness in the application of § 8105(1) lies with the Legislature.

Finally, any conclusion that a $400,000 cap applies to all remaining claims in this case would not be the end of the inquiry with respect to the limit of liability in this case. Left to be decided is whether the City, by being named as an additional insured for certain of the years in question, has expanded the limit of liability under 14 M.R.S. § 8116.

The entry shall be:

The City's motion for summary judgment is granted as to plaintiffs Jay Frye, Sadie Thomas-Frye, Mark Hudson, and Hayley Saunders, based on the statue of limitations and the complaints in Docket Nos. CV-06-448, CV-06-450, CV-06-451, and CV-07-91 are therefore dismissed. In all other respects the City's motion for summary judgment is denied at this time.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:     September _10_, 2008.

_____
Thomas D. Warren
Justice, Superior Court

IVY FRIGNOCA ESQ
PO BOX 15215
PORTLAND ME 04112

*Plaintiffs*

COURTS
d County
( 287
04112-0287

GERALD PETRUCCELLI ESQ
PO BOX 17555
PORTLAND ME 04112

*Scotia Prince*

ine 04112-0287

MARK DUNLAP ESQ
PO BOX 4600
PORTLAND ME 04112

*City of Portland*